Reyes BARRERA, Jr., Plaintiff in error,

v.

STATE of Wisconsin, Defendant in error-Petitioner.

Supreme Court

*No. 78–542–CR. Argued October 1, 1980.—*
*Decided November 25, 1980.*

(Also reported in 298 N.W.2d 820.)

272

For the defendant in error-petitioner the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the plaintiff in error the cause was argued by *Jack E. Schairer,* assistant state public defender, with whom on the briefs were *Richard L. Cates,* state public defender, *Robert J. Paul,* deputy state public defender, and *Charles Bennett Vetzner,* assistant state public defender, of counsel.

COFFEY, J. This is a review of a decision of the court of appeals reversing a circuit court judgment convicting Reyes Barrera, Jr., of party to the crime of first-degree murder and armed robbery, contrary to secs. 940.01, 943.32(2) and 939.05, Stats. After the jury trial the defendant was ordered committed to a term of life imprisonment on the murder charge and a consecutive sentence not to exceed 20 years for the armed robbery.

This action arose out of an armed robbery at the Park Avenue Liquor Store in Beaver Dam, Wisconsin, on October 15, 1976. The owner of the liquor store, Mrs. Janis Bussie, was shot and killed during the course of the robbery.

The facts adduced at trial establish that the defendant and his friend, Frederico Garcia, left Adrian, Michigan, on October 13, 1976, to travel to San Antonio, Texas, with a total of $80 between them to be used for traveling expenses. The two stopped en route in Beaver Dam, Wisconsin, to visit the defendant's brother, Eduardo Barrera, on October 14, 1976. The defendant's brother accepted their invitation to accompany them on their trip to Texas. On the morning of October 15, 1976, the men stopped

at the Park Avenue Liquor Store where the defendant and Garcia each stole a bottle of wine.

The three men then drove into the countryside to test shells in Garcia's sawed-off shotgun. Garcia testified to a conversation with Barrera at about this time in which the defendant stated he was going to rob the lady in the liquor store if she was alone. Shortly before noon, the trio returned to the Park Avenue Liquor Store.

Barrera drove to the back of the store and told his brother to keep the car door open and to start the engine when he returned. He put the gun under his coat and went into the store. He returned to the car shortly thereafter, cocked the shotgun and expended a spent shell in the car. Garcia testified that the defendant appeared shaken as he drove off at a high rate of speed.

Next Barrera stopped the car at a gas station in Horicon, Wisconsin, and, according to Garcia, announced that he would rob the woman attendant if she were alone. She was not alone, and thus no robbery took place. Shortly after they left Horicon, Garcia testified that the defendant told them that he had shot the proprietor of the liquor store in Beaver Dam as she reached for a telephone.

Garcia then related that the defendant became extremely angry in Missouri when a gas station attendant spilled some gasoline on the ground and declared that someone was going to pay for the attendant's mistake. Shortly thereafter, when they stopped at another gas station in Marston, Missouri, the defendant robbed, shot and killed another woman, attendant Kathy Evans, approximately twelve hours after the killing in Beaver Dam.

Garcia, although previously advised not to refer to his polygraph examination by the prosecutor made reference to a "lie test" in explaining the circumstances surrounding his decision to testify for the state and against Bar-

rera. The defense then moved for a mistrial in the absence of the jury, claiming that Garcia's remark about a "lie test" was prejudicial. The court denied the defendant's motion and in the absence of a request by Barrera, did not *sua sponte* give a cautionary instruction.

The defendant, when testifying at the trial, stated that the shooting of Mrs. Bussie in Beaver Dam was accidental and further denied any involvement in the Missouri killing. He said that when pointing the gun at Mrs. Bussie (Beaver Dam) he was nervous and trembling because he was "coming off this heroin" and that when he reached for the money, Mrs. Bussie grabbed the gun, causing it to fire accidentally during the ensuing struggle.

Garcia and the defendant were charged with party to the crime of first-degree murder and armed robbery, arrested in Texas by F.B.I. agents under the unlawful flight statute, 18 U.S.C.A., §1073, and subsequently brought back to Wisconsin to stand trial.[1]

On April 5, 1977, a *Goodchild* pre-trial hearing was held to determine the admissibility of the defendant's statements to Robert Anderson, the polygraph examiner and certain law enforcement officials. At this hearing, the defense counsel stipulated to the voluntariness and admissibility of all statements given to Anderson. The statements to Mr. Anderson were obtained during two attempted but unsatisfactory polygraph examinations, on March 7 and March 17, and a pretest interview on April 4, 1977. In the conversation on April 4 the defendant admitted shooting Mrs. Bussie in Beaver Dam and Kathy Evans in Missouri.

At trial, however, defense counsel reversed his posisition and challenged the voluntariness of the statements and moved to suppress the April 4 statement. The trial

---

[1] The record is silent as to whether the defendant was extradited or waived extradition.

court conducted a second *Goodchild* hearing outside the presence of the jury and reviewed a tape recording of the April 4 interview and ruled that the defendant's statements to Anderson were admissible.

After the jury trial, a judgment of conviction was entered on April 19, 1977. A motion for a new trial was heard and denied, and Barrera filed a writ of error to review the judgment of conviction. The court of appeals reversed the circuit court and remanded the case for a new trial. The state petitioned this court to review the appellate court's decision.

*Issues*

1. Did the trial court commit reversible error in admitting alleged prejudicial evidence of another crime?

2. Was Barrera's confession to Robert Anderson, the polygraph examiner, during the pretest interview on April 4, 1977, admissible in the absence of a *Stanislawski*[2] stipulation?

3. Was the trial court in error in ruling that the defendant's confession to Robert Anderson was voluntary?

4. Did the trial court commit reversible error in failing to give *sua sponte* a cautionary instruction to the jury in the absence of a request for the same after the witness, Garcia, made reference to a lie test?[3]

*Other Crimes Evidence*

Prior to trial, the prosecutor informed the court and the defense counsel that he intended to offer testimony

---

[2] *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974).

[3] An additional issue before the appellate court involved a claim by the defendant that the trial court committed prejudicial error in allowing a picture depicting the gunshot wound to Mrs. Bussie's face to go to the jury. The appellate court rejected this contention and held that no error was committed in this respect. We do not address this claim because it was withdrawn on oral argument.

of the Missouri incident, the second killing and robbery, for the purpose of showing intent and absence of mistake or accident in the killing of Mrs. Bussie in Beaver Dam. Before trial, the prosecutor made an offer of proof in this regard and asked the court for a ruling on admissibility after he advised the court he intended to make reference to the Missouri slaying in his opening statement. In his offer of proof the prosecutor stated that Garcia would testify that on their way to Texas the three men stopped at a filling station in Marston, Missouri, where the defendant robbed, shot and killed the female attendant within 12 hours after the killing in Beaver Dam. He also stated that Mr. Anderson would testify that the defendant admitted to the slaying of the two women, one in Wisconsin and the other in Missouri.

Defense counsel objected to the introduction of the evidence of the Missouri killing on the grounds that the danger of unfair prejudice in its admission would substantially outweigh its probative value. The court noted in its decision that the defendant's objection required it to balance the alleged prejudicial effect of this testimony against its probative value and ruled this evidence "is admissible under the circumstances of which the court is aware at this time and the court is making this determination, not at the time the evidence is introduced, but at the request of the attorneys because the attorneys are about to give opening statements to the jury, and it is born out of necessity here that the court give an indication of its ruling and viewpoint concerning such evidence on the trial." Further, the court informed the defense counsel that he could renew his objection when the testimony was offered into evidence.

At trial, Frederico Garcia related the events leading up to the killing of the service station attendant in Missouri. Garcia testified in part that Barrera went into the gas station with the shotgun tucked close to his body and

underneath his coat and shot and killed the woman attendant as she stepped back away from the cash register after handing him the money.

Robert Anderson, the next witness called to the stand, testified that Barrera admitted the Bussie killing as well as robbing and killing a service station attendant in Missouri with the same shotgun, some 12 hours later.

At trial the defense counsel did not object to this testimony of Garcia and Anderson, nor did he challenge the admissibility of this evidence in his motion for a new trial.

The court of appeals noted that although counsel's objection to receipt of the evidence of the Missouri robbery and killing had not been renewed at trial or raised as a ground for relief in the trial court by motion for a new trial, the court, on its own, exercised its discretionary authority to review the claimed error. It concluded that the evidence of the Missouri killing was not relevant, and that even if relevant, its probative value was outweighed by the danger of undue prejudice. On review in this court, the defendant reiterates the decision of the court of appeals.

This court has set forth the rules governing the admissibility of "other crimes evidence" many times. *See: e.g., Vanlue v. State,* 96 Wis.2d 81, 291 N.W.2d 467 (1980) ; *Hammen v. State,* 87 Wis.2d 791, 275 N.W.2d 709 (1979) ; *McClelland v. State,* 84 Wis.2d 145, 267 N.W.2d 843 (1978). Wisconsin's leading case dealing with other crimes evidence is *Whitty v. State,* 34 Wis.2d 278, 149 N.W.2d 557 (1967) *cert. den.* 390 U.S. 959. This court in *Whitty* adopted what has come to be known as the two-pronged test for determining the admissibility of other crimes evidence. First, the party seeking to introduce this evidence must demonstrate that it is not being offered for the sole purpose of showing that the defendant had a disposition to commit the crime. *Ham-*

*men, supra* at 798; *McClelland, supra* at 156. That is to say, other crimes evidence may be admissible if it is probative of intent, identity, or an element of the specific crime charged and this probative value outweighs its prejudicial effect. *Whitty, supra* at 292. This rule has been enacted as sec. 904.04(2) of the Wisconsin Rules of Evidence:

"(2) OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The relevancy of evidence regarding other criminal conduct "depends *in part* upon its nearness in time, place and circumstances to the alleged crime or element sought to be proved." (Emphasis supplied.) *Whitty, supra* at 294.

However, after determining the question of relevancy as to motive, opportunity, intent, etc., the trial court must also consider "whether the prejudice of other crimes evidence is so great as compared with its relevancy and the necessity for its admission in the particular case as to require its exclusion." *Whitty, supra* at 295. Sec. 904.-03, Stats.[4] The decision to admit or exclude relevant other crimes evidence after the trial court has engaged in the requisite weighing process to determine whether the probative value of the evidence is outweighed by its

---

[4] Sec. 904.03, Stats., now incorporates this facet of the *Whitty* test:

"**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

prejudicial effect is a discretionary function of the trial court, *Vanlue, supra; McClelland, supra; Hough v. State,* 70 Wis.2d 807, 235 N.W.2d 534 (1975) ; *State v. Hutnik,* 39 Wis.2d 754, 159 N.W.2d 733 (1968), and the question on appeal:

". . . is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record. *McCleary v. State,* 49 Wis.2d 263, 182 N.W.2d 512 (1971). The test is not whether this court agrees with the ruling of the trial court, but whether appropriate discretion was in fact exercised." *State v. Wollman,* 86 Wis.2d 459, 464, 273 N.W.2d 225 (1979).

Thus, according to *Whitty,* we must first determine whether the evidence of the circumstances surrounding the killing of the service station attendant in Missouri is relevant to motive, opportunity, intent, etc. The grounds offered in support of admission of this evidence was that it was probative of the defendant's intent, plan and lack of accident in the killing of Mrs. Bussie. The appellate court held that the Missouri slaying was too remote in time and space to have this effect, in spite of the fact that it occurred only 12 hours later (time) on the same trip to Texas (space, event) and that the defendant and his companions were short of funds (intent).

Relevant evidence is defined in sec. 904.01, Stats., as follows:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In *Hicks v. State,* 47 Wis.2d 38, 43, 176 N.W.2d 386 (1970), this court, quoting from 1 Wharton's, Anderson,

*Criminal Evidence* (12th ed.) p. 284–87, sec. 148, set
forth the definition of relevancy:

" ' "Evidence is relevant when it is persuasive or indi-
cative that a fact in controversy did or did not exist be-
cause the conclusion in question may be logically inferred
from the evidence. The criterion of relevancy is whether
or not the evidence adduced tends to cast any light upon
the subject of the inquiry. Evidence of any fact is ad-
missible as relevant which might establish the hypothesis
of innocence, or show the defendant's guilt. Any evi-
dence that assists in getting at the truth of the issue
is relevant; in other words, *any fact which tends to
prove a material issue is relevant, even though it is only
a link in the chain of facts which must be proved to
make the proposition at issue appear more or less prob-
able. Relevancy is not determined by resemblance to, but
by the connection with, other facts."* (emphasis sup-
plied.)' "

Moreover, this court has stated:

" 'In proof of criminal intent, the conduct of a defend-
ant on other occasions closely connected in point of time
and plan may at times be relevant to throw light on the
defendant's motives and intentions while doing the act
complained of. *Smith v. State,* 195 Wis. 555, 560, 218
N.W. 822; *State v. Meating,* 202 Wis. 47, 50, 231 N.W.
263. "The intention with which a particular act is done
often constitutes the burden of the inquiry, and to prove
the intent it becomes necessary, in many instances, to
extend the examination beyond the particular transaction
concerning which the accused is upon trial. For the pur-
pose, therefore, of proving intent, not of proving the act
itself, it is often permissible to show other *criminal trans-
actions of the same sort springing from like mental con-
ditions."* 2 Jones, Evidence (2d ed.), p. 1161, sec. 624.' "
(Emphasis supplied.) *State v. Hutnik, supra* at 761–62.

The record clearly demonstrates that the evidence ob-
jected to passes the first prong of the *Whitty* test and
was properly admissible under sec. 904.04(2), Stats., as

it is probative of intent, the distinguishing element of the crime of first degree murder from other degrees of manslaughter. The Missouri slaying occurred only 12 hours after the shooting of Mrs. Bussie in Beaver Dam and the defendant used the same modus operandi, *i.e.,* the same shotgun, the victims were females and alone and Barrera initially concealed the weapon under his coat. Thus, the evidence of the shooting in Missouri was relevant to show that both slayings *sprang from like mental conditions. State v. Hutnik, supra.* Moreover, the evidence was of consequence to the determination of plan or scheme. *Simpson v. State,* 83 Wis.2d 494, 510, 266 N.W.2d 270 (1978). Therefore, we hold that the appellate court erred in ruling that the testimony regarding the shooting in Missouri was irrelevant.

Turning to the requirement that the trial court must weigh the probative value of other crimes evidence against the prejudicial effect of its admission, we initially note that the defendant failed to object at trial to the testimony relating the killing in Missouri. Rather, defense counsel's only objection to this evidence on the ground of undue prejudice was made in a motion *in limine* and not renewed at trial.

This court has stated that a trial judge has no obligation to exclude evidence on the ground of undue prejudice when the objector fails to make the proper motion at trial. *McClelland, supra* at 158. *See also: State v. Stawicki,* 93 Wis.2d 63, 74–75, 286 N.W.2d 612 (Ct. App. 1979). Hence, on the question of receiving evidence of other crimes dealing with the issue of probative value versus prejudicial error, we hold that the failure of the defendant to raise this objection at trial and in his motion for a new trial in the absence of constitutional dimensions bars the defendant from predicating error on the failure of the trial court to balance these considera-

tions. Moreover, we note that the trial court, in its ruling on the motion *in limine* made an initial determination that the probative value of the testimony regarding the killing in Missouri outweighed its prejudicial effect. This court will uphold a discretionary decision of the trial court to admit other crimes evidence if the record supports that decision. *Vanlue v. State, supra* at 92; *Hammen v. State, supra* at 800. Thus, we conclude on the record in this case there was no abuse of discretion on the part of the trial court in finding that the probative value of the evidence concerning the Missouri killing outweighed any possible prejudicial effect. In this regard, we note that the record fails to reflect that the appellate court reviewed the trial court's exercise of discretion in admitting this evidence. Rather, the court of appeals made its own conclusion that the probative value of this evidence would be outweighed by its inflammatory nature. In so doing, the appellate court usurped the function of the trial court. We caution the appellate court against taking on the role of the trier of fact. *See,* e.g., *Wurtz v. Fleischman,* 97 Wis.2d 100, 293 N.W.2d 155 (1980).

## Absence of a Stanislawski Stipulation

In *State v. Stanislawski,* 62 Wis.2d 730, 742, 216 N.W. 2d 8 (1974), this court set out the written stipulation standard for admission of polygraph tests and a polygraph examiner's interpretation of the same in the following language:

*"As to polygraph tests taken by the defendant* and expert testimony related thereto, polygraph testimony is admissible in this state, as in Arizona under *Valdez '. . .* to corroborate other evidence of a defendant's participation in the crime charged,' and, 'If he takes the stand such evidence is admissible to corroborate or impeach his own testimony.' The required preconditions or quali-

fications for the admission of such testimony, in this state as in Arizona under *Valdez*, are as follows:

"(1) That the district attorney, defendant and his counsel all sign a written stipulation providing for the defendant's submission to the test and for the subsequent admission at trial of the graphs, and the examiner's opinion thereon on behalf of either defendant or the state."

After his arrest, Barrera submitted to a polygraph examination with the consent of his attorneys. However, it was understood that the results of the polygraph test would not be admissible as the parties had not signed a written stipulation providing for the same as set out in *Stanislawski*. As noted earlier, the defendant was examined by Robert Anderson of the State Crime Lab on March 7 and again on March 17, 1977. However, Anderson determined that due to Barrera's anxiety ratio, he was unable to reach any definitive conclusions regarding the results of these tests. After advising the defendant and his attorneys of this fact, Barrera agreed to submit to a third test on April 4, 1977. On this date Anderson conducted a pretest interview of the defendant, his usual procedure in preparation for a polygraph examination. During the course of this interview, Barrera admitted the Beaver Dam and Missouri murders. At trial, and at the time of the hearing on the motion for a new trial, the defendant failed to claim that his statement to Anderson on April 4th was inadmissible for want of a *Stanislawski* stipulation. Rather, the *Stanislawski* issue was raised for the first time in the court of appeals. As pointed out earlier, the appellate court reached the stipulation question on its own because it felt that the issue of the admissibility of Barrera's statement to Robert Anderson on April 4, 1977 "is likely to arise at retrial if not disposed of here." It held that the defendant's April 4th statement was inadmissible under

their interpretation of the logic and holding of *State v. Schlise,* 86 Wis.2d 26, 271 N.W.2d 619 (1978).

In *Schlise, supra,* this court stated that the *Stanislawski* written stipulation rule applied to information elicited in a "post-mechanical interview" and thus in the absence of a written stipulation, statements made by an examinee during post-examination questioning were held inadmissible.

*Schlise* was an appeal of the conviction of Donald Schlise as party to the crime of first degree murder. The charges arose out of the killing of Donald's wife, Irene Schlise. The defendant submitted to a polygraph examination and confessed to the examiner, Robert Anderson, during the course of the post-test interview. In this interview, Anderson persuaded Schlise to talk about the death of his wife and confronted the defendant with the test results he had just received every time he suspected Schlise was not telling the truth. The court quoted the following example of the type of questioning Anderson engaged in:

" 'The first chart, right, we concluded basically four things. OK. Number one, you did ask someone to kill your wife, OK, we concluded that. We also concluded that you hired someone to harm her. Ok, this is sort of a secondary relevant issue concerned with the set up. And we also concluded one other thing. Do you know for sure who killed Irene. We concluded those three things. Now Don, I've been involved in this type of work for a long time and there's always two sides to every story. OK. What I don't know right now for sure I know you contracted with someone to kill, not necessarily kill your wife, but to harm her. Sometimes when you make up a contract like this things go a little bit wrong and sometimes maybe you had no intentions of say, really killing your wife when you hired this guy but what happened he went a little bit too far and she died. Now I don't know for sure at this point whether that's what happened or in fact you actually did ask this person to

kill her. Don, again, many many things cause this. It can be caused from an unhappy marriage. It can be caused from pressure at home, pressures at work. In other words, what I'm saying is sometimes you get up in the morning and you touch something and everything just sort of turns to shit, doesn't it. I think we all have these days. Don, I can look at you now and some of the visual signs are beginning to really set in, the dryness of the mouth, the dilation of the eyes, you've got a lot on your mind now, the thing is Don that to get some psychological and also physical relief from this I would suggest now that you start telling the truth. Tell me exactly what happened, how this thing got started.'

" 'Sure, OK, that's what I want you to be. Now, Don I also feel that you wanted to dispose of your wife from looking at your charts and I think right now you're rationalizing a little bit.'

" 'Now wait a minute. Don, before you say too much more and get yourself out on a limb, I know you're not being truthful and I'll tell you why. Some of the names I read to you we know you talked to, OK?'

" 'Sure, we know you talked to them, and we know that the initial contact back in July and August was to kill your wife, OK? One of these individuals has already come forward, and given a complete statement and this is the reason you're down here. So we can more or less verify to see if he's telling the truth.' " *Schlise, supra* at 40–41.

At the *Schlise* trial, Anderson's testimony relating to the results of the polygraph examination and the defendant's statement in the post-test interview were received over the defense counsel's objection on the grounds of lack of voluntariness and the absence of a *Stanislawski* stipulation. This court set aside the conviction and remanded the case for a new trial as the test results and Schlise's post-examination statement were admitted into evidence without a written stipulation and because we had serious doubts regarding the voluntariness of the defendant's confession due to the psychologically coercive tactics of the examiner as detailed in the record. *Schlise,*

*supra* at 49. We recited our concern respecting the voluntariness issue in the following language:

"We further conclude that upon the remand for a new trial upon proper motion by the defendant, another *Goodchild* hearing should be conducted to determine whether the post-mechanical phase of the polygraph examination was so psychologically coercive as to render the defendant's admissions involuntary, and whether the subsequent statements were voluntary or so tainted by the prior statement to Anderson (if it was) so it cannot be said they were freely and voluntarily given." *Id.*

Thus, the written stipulation issue was not the sole concern in *Schlise* regarding the decision to exclude the defendant's statement in the post-test interview.

There are a number of important differences between the facts of this case and those of *Schlise*. In *Schlise,* we concluded that the *Stanislawski* stipulation rule applied because: "The post-mechanical interview was so closely associated with the mechanical or electronic testing, *both as to time and content,* that it must be considered as *one event* and because of the lack of a *Stanislawski* stipulation excluded from evidence." (Emphasis supplied.) *Schlise, supra* at 43–44. The close association in both *time and content* between the mechanical test and the post-test interview in *Schlise* arose from the fact that the interview occurred only *twenty minutes* after the mechanical test (time) and that the examiner used concurrent test results and psychologically coercive tactics that posed serious questions as to the voluntariness of Schlise's statements (content).

In this case, contrary to *Schlise,* there was no interpretation and use of concurrent test results as no mechanical test was given to Barrera on the date of the confession, April 4, 1977. Thus, this case lacks the close association between the content of both the mechanical test and the interview in *Schlise*. Moreover, since a mechanical

test was not administered in this case on April 4, 1977, the only test results that this interview could be associated with as to the time element are the inconclusive results obtained on the 7th and 17th of March, some 28 and 18 days before the confession. Thus, as contrasted with the twenty minute time span in *Schlise*, the requirement of a close association in time is not present in this case. Further, in support of our conclusion that this case lacks a temporal association between the pretest interview and a mechanical test, we quote the following language from *Schlise:*

"This is not intended to suggest that all post-examination interviews between a subject and the examiner will be subsumed into the special category of polygraph evidence and fall within *Stanislawski. Turner v. State,* 76 Wis.2d 1, 250 N.W.2d 706 (1977), and *McAdoo v. State,* 65 Wis.2d 596, 223 N.W.2d 521 (1974) . . . are clear authority for the opposing view, i.e., *that in certain factual settings such interviews may be found to be totally discrete from the examination which precedes them.* It should be noted, in this regard, that the Anderson interview at issue in *Turner* took place *six days* after the polygraph test." (Emphasis supplied.) *Schlise, supra* at 42.

It is apparent from this quotation that the *Schlise* court determined that the passage of *six days* in the *Turner* case between the administration of a polygraph examination and an interview with the examiner on the date a second test was scheduled was sufficient to render the interview a "discrete" event. As previously noted, Barrera was tested on March 7 and March 17, *28* and *18* days prior to the April 4 interview. Thus, under our holding in *Turner v. State,* 76 Wis.2d 1, 250 N.W.2d 706 (1977) as distinguished in *Schlise,* the long lapse of time in this case between the administration of a mechanical test and the date of the confession, rendered the April 4th interview a discrete event in relation to

the prior two tests, and, therefore, this interview was not closely associated in time with a mechanical test.

*Schlise, supra, Turner, supra* and *McAdoo v. State,* 65 Wis.2d 596, 223 N.W.2d 521 (1974), demonstrate that insofar as the written stipulation rule is concerned, admission of statements made during the course of an interview with a polygraph examiner is dependent upon whether the interview is a discrete event with respect to the mechanical portion of a polygraph test. Under *Schlise*, the interview will not be considered a separate event where it is "so closely associated with the mechanical or electronic testing, both as to time [20 minutes] and content, that it must be considered as one event. . . ." *Id.* at 43. This determination can only be made upon a careful consideration of the totality of the facts and circumstances in the individual case. In *Schlise*, the close association between the mechanical test and the interview that produced the confession was as noted above supplied by the concurrent test results and psychologically persuasive questioning techniques which under a consideration of the circumstances of the post-test interview appeared to present a substantial voluntariness issue. As compared with *Schlise*, the confession in this case was made in a *pretest* interview some 18 days after the examiner's last contact with the defendant. This, in turn, precluded the examiner from confronting the defendant with concurrent test results. But, after a search of the record, we disagree with the defense counsel's argument that the examiner in this case used questionable psychologically coercive tactics to procure Barrera's confession.[5]

Thus, in the absence of use of concurrent test results and psychologically persuasive questioning tactics, this case lacks the close association in *content* between a

---

[5] *See* voluntariness discussion, *infra.*

mechanical test and the pretest interview that was present in *Schlise*. To repeat, the fact that 18 and 28 days elapsed between the time of the April 4 interview and Barrera's previous tests clearly demonstrate that this interview was not associated in *time* with a mechanical test. *Turner, supra*. Thus, we have distinguished the facts and circumstances in this case from those of *Schlise* in that the April 4 interview was a discrete and separate event and not "so closely associated with the mechanical or electronic testing, both as to time and content, that it must be considered as one event. . . ." *Schlise, supra* at 43. Therefore, we hold that the *Stanislawski* written stipulation rule does not, as the defendant contends, bar the receipt of Barrera's confession in this case.

## Voluntariness

At trial the court held a second *Goodchild* hearing to determine if the defendant's confession to Anderson during the course of the April 4 interview was voluntary and given after a valid waiver of *Miranda* rights. The April 4 interview was recorded on tape and the court reviewed this tape prior to the hearing.[6] At the hearing, Barrera and Anderson testified to the content of the interview, and the trial judge concluded orally that the confession was voluntarily given after a knowing and intelligent waiver of *Miranda* rights and therefore admissible. On review, the defendant challenges this ruling claiming that the confession was not voluntary.

Anderson, before commencing the interview, read the *Miranda* rights to Barrera in the presence of his at-

---

[6] The tape was not included with the exhibits sent up on appeal. Our knowledge of what transpired during the course of the interview is limited to that related to us in the parties' briefs and the testimony of Anderson and Garcia at both the second *Goodchild* hearing and trial.

torneys and obtained the defendant's signature and the signature of one of his attorneys on a *Miranda* waiver form.[7] The interview lasted between 40 to 45 minutes. During the course thereof, Anderson confronted Barrera with the results of a polygraph test that had been given to Frederico Garcia, stating that Garcia had told the truth when he said that the defendant shot Mrs. Bussie. Anderson testified that at this point he sensed that Barrera was ready to confess and he decided to pursue this possibility. Thereafter, Anderson accused the defendant of shooting Mrs. Bussie and stated that he wanted to know why. Anderson frequently asked the defendant to tell the truth and engaged in a discussion of religion and religious convictions which ended in a statement that Barrera would have to face up to it when he met his savior. Up to this point, the defendant had been giving non-verbal responses. Anderson asked Barrera if he would talk to him if the tape recorder were turned off. The defendant gave an affirmative verbal response and the recorder was turned off for about five minutes. During this period Barrera cried and confessed. Anderson then turned the recorder back on and capsulized the defendant's statement on tape. The defendant then requested his attorney who was summoned immediately and the interview was terminated.

At the *Goodchild* hearing, Barrera indicated that his confession was induced by the talk about God and religion stating "that's my weak spot . . . because I really love God . . . ," and by the disclosure of Garcia's polygraph test results.

The defendant claims that Anderson was "patronizing" Barrera and that his references to God, his inform-

---

[7] This was Anderson's standard operating procedure and was followed before the administration of the tests on March 7 and 17, 1977.

ing the defendant that Garcia had been truthful when he denied shooting Mrs. Bussie, together with his continued requests that the defendant tell the truth, brought overwhelming coercive psychological pressure to bear on Barrera and thus rendered the confession involuntary.

The trial court found that Barrera's statement to Anderson on April 4, 1977, was voluntary beyond a reasonable doubt. Since the questioning of an accused by a polygraph examiner constitutes custodial interrogation, *Wentela v. State,* 95 Wis.2d 283, 292, 290 N.W.2d 312 (1980), the rules regarding the voluntariness of statements in this setting apply. Accordingly, this court will affirm a trial court's determination with respect to voluntariness unless it appears that the findings made were against the great weight and clear preponderance of the evidence. *Turner, supra* at 17; *Grennier v. State,* 70 Wis.2d 204, 209, 234 N.W.2d 316 (1975); *McAdoo, supra* at 605.

Voluntariness is determined by looking to the "totality of the circumstances" surrounding the making of the statement. *State v. Schneidewind,* 47 Wis.2d 110, 176 N.W.2d 203 (1970). The pertinent inquiry is whether the confession was coerced or the product of improper pressures exercised by the person or persons conducting the interrogation. *Turner, supra* at 18. This assessment calls for a balancing of the personal characteristics of the confessor with the pressures brought to bear upon him. *Turner, supra* at 18; *Grennier, supra* at 210, citing *State v. Wallace,* 59 Wis.2d 66, 81, 207 N.W.2d 855 (1973).

The personal characteristics of the accused that should be considered in this balance are ". . . his age, his education and intelligence, his physical and emotional con-

dition, and his prior experience with the police." *Grennier, supra* at 212; *See also: Schneidewind, supra* at 117 and *McAdoo, supra* at 606. These characteristics are to be weighed against "any inducements, methods and stratagems which were used to persuade the accused to confess." *Schneidewind, supra* at 117, citing *Lynumn v. Illinois,* 372 U.S. 528 (1963). This includes a consideration of the length and conditions of the questioning and the psychological and physical pressures exercised by the interrogator. *Grennier, supra* at 212. It is also relevant whether the confessor was apprised of his *Miranda* rights, specifically his right to counsel and his privilege against self-incrimination. *Id.* at 210–211.

The record shows that the defendant was 26 years of age, from a Latino background and spoke and understood English very well and further that he was treated well by Wisconsin authorities and in good physical condition. The record does not disclose the extent of his education or whether he had prior involvement with law enforcement officers. However, it is eminently clear that Barrera understood his constitutional rights as he had been advised of them on at least four prior occasions and had in fact exercised them to terminate the April 4 interview.

In his testimony at the second *Goodchild* hearing, Barrera stated that it was the talk about God and Garcia's polygraph results that induced him to confess. The confrontation of the defendant with information against him "whatever that may be, does not amount to the utilization of overwhelming force or psychology. *Krueger v. State,* 53 Wis.2d 345, 356, 192 N.W.2d 880, 886 (1972)." *Turner, supra* at 22. Turning to the reference to God, the defendant does not refer us to a case[8] and

---

[8] The defendant, however, did cite *Brewer v. Williams,* 430 U.S. 387 (1977), in which a confession and incriminating evidence was obtained after the use of a "Christian burial speech."

we have been unable to find any that are supportive of the claim that a discussion of religion and religious convictions concluding with the statement to Barrera that he would have to face up to it when he met his maker was so overbearing as to render his confession involuntary. Furthermore, under the totality of the circumstances test, we agree with the trial court's finding that the confession was freely and voluntarily given after a thorough rendition and understanding of the *Miranda* rights and therefore admissible.

*Lie Test Reference*

The defendant's final contention is that the trial court erred in failing to order a mistrial or give a cautionary instruction after the state's principal witness, Garcia, made reference to a lie test at the close of his direct examination. The exact testimony is as follows:

"Q. Freddie, your attorney told you that we had an agreement regarding your testifying here today; didn't he?
". . .
"A. Yes, he did.
"Q. Based upon that agreement, what were you to do?
"A. Tell the truth.
"Q. Were you to testify in this trial, also?
"A. Yes.
". . .
"Q. The reason for your testimony and telling the truth, did your attorney tell you whether or not you would be prosecuted for murder?
"A. Right, he told me I wouldn't be prosecuted for murder.
"Q. Did he tell you that you would be prosecuted for robbery?
"A. Yes, he told me I would be prosecuted for robbery; that based upon my testimony and another lie test, telling the truth."

---

This case is not in point, as it dealt with the waiver of the right to counsel and not the question of voluntariness.

Counsel for the defendant, in the absence of the jury, then moved for a mistrial. The court, being informed that Garcia had been warned against referring to his polygraph examination in front of the jury, advised the prosecutor to caution Garcia again and denied the motion for mistrial stating that it did not believe that Garcia's reference to a "lie test" was "so prejudicial as to cause that result." Defense counsel did not request a cautionary instruction and none was given.

This court has consistently held that the failure of a trial court to *sua sponte* instruct the jury to disregard certain testimony will not support a claim for prejudicial error. *Whitty v. State, supra* at 290 and cases cited therein. This rule is based on the policy of placing the primary duty of trying a lawsuit upon trial counsel, not the trial judge. *Id.* We see no reason for changing this rule in the case herein. Thus, we find no error in the trial court's failure to instruct the jury to disregard Garcia's reference to a lie test in the absence of a request by defense counsel.

The central issue presented here is whether the trial court committed reversible error in denying the defendant's motion for a mistrial, or, conversely, assuming that Garcia's reference to his lie test was error, whether this statement was harmless error.

The defendant argues that reversal is required because the jury could infer from the reference to his lie test that Garcia, the state's major witness, was telling the truth.

The test for determining harmless error was most recently set out in *Pohl v. State,* 96 Wis.2d 290, 311, 312, 291 N.W.2d 554 (1980) :

" ' "Errors committed at trial should not overturn the conviction unless it appears the result might probably have been more favorable to the party complaining had the error not occurred." *Hart v. State,* 75 Wis.2d 371,

249 N.W.2d 810 (1977). In *Wold v. State,* 57 Wis.2d 344, 356, 204 N.W.2d 482 (1973), a case involving improperly admitted evidence, the court stated:

" ' "The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt. See *Harrington v. California* (1969), 395 U.S. 250, 89 Sup. Ct. 1726, 23 L. Ed.2d 284. This test is based on reasonable probabilities."

" 'Other formulations of the harmless error test would require reviewing courts to set aside the verdict and judgment unless sure that error did not influence the jury or had but only slight effect. *Kelly v. State,* 75 Wis.2d 303, 317 n. 3, 249 N.W.2d 800 (1977) and concurring opinion at 321.' *Id.* at 308."

■

The questioned testimony was a brief, vague reference to a polygraph examination that had been taken by the witness and was not at all related to the question of Barrera's guilt. Moreover, in view of the overwhelming evidence of Barrera's guilt and the fact that Garcia's testimony relating the circumstances of the two killings, Mrs. Bussie in Beaver Dam and Kathy Evans in Missouri, was wholly corroborated by the polygraph examiner, Robert Anderson, who related the confession that was given him by the defendant, we conclude that disregarding the assumed inadmissible evidence, there was sufficient evidence to convict the defendant beyond a reasonable doubt. Further, there is no evidence that Garcia's reference to his polygraph examination influenced the jury. Thus, we conclude that in the absence of the defense attorney's request for a precautionary instruction, the judge's failure to give the same was not error. On the other hand, were we to classify the failure to give an instruction concerning the "lie test," the error

would be classified as harmless, and therefore, not a ground for reversal.

*By the Court.*—The decision of the court of appeals is reversed and the judgment of conviction is affirmed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. I would affirm the court of appeals' decision and hold that it was error for the circuit court to admit the polygrapher's testimony. I so conclude because this case is governed by *Schlise* and because the admission of the polygrapher's testimony violates the state and federal constitutional guarantees of right to counsel and due process.

In *State v. Schlise,* 86 Wis.2d 26, 271 N.W.2d 619 (1978), this court addressed the question of the admission of a polygrapher's testimony and held inadmissible, in the absence of a *Stanislawski* stipulation, "not only the polygraph evidence and the examiner's opinion of the significant conclusions to be drawn therefrom, but also his testimony concerning the post-mechanical interview." *Schlise, supra,* 86 Wis.2d at 42.[1] *Schlise* did

[1] The majority opinion states that "The written stipulation issue was not the sole concern in *Schlise* regarding the decision to exclude the defendant's statement in the post-test interview." 99 Wis.2d at 286. The majority explains that the *Schlise* court "had serious doubts regarding the voluntariness of the defendant's confession due to the psychologically coercive tactics of the examiner as detailed in the record." I disagree with this analysis of *Schlise.* In excluding the post-mechanical interview the court did not consider whether Schlise's statements to Anderson were voluntarily given. The court discussed the possible coercive aspect of Schlise's interview in its discussion of remanding the case to consider whether Schlise's later statements to police officers were tainted by the Anderson interview. The court said in *Schlise:*

"After Anderson's testimony the court, out of hearing of the jury, explicitly found the statement of Schlise to Anderson was voluntarily given.

"We conclude that it was prejudicial error to receive the testimony of the polygraph examiner, Robert Anderson, because a

not establish a blanket rule rendering inadmissible testimony concerning all post-mechanical interviews; after *Schlise*, as before, testimony about interviews "totally discrete from the mechanical examination which precedes them" remains admissible.

The court's rationale in *Schlise* for exclusion of this evidence under *Stanislawski* was an acknowledgment of the inseverability of the post-mechanical interview and the mechanical portion of the polygraph. The interview and the mechanical testing, when closely related in time and content, must be considered as one event. Thus if there is no *Stanislawski* stipulation allowing the mechanical test results to be introduced into evidence, there can be no introduction into evidence of the post-mechanical interview. As the court explained: "The post-mechanical interview was so closely associated with the mechanical or electronic testing, both as to time and content, that it must be considered as one event and because of the lack of a *Stanislawski* stipulation excluded from the evidence." *Schlise, supra*, 86 Wis.2d at 44.

Whether *Schlise* controls this case depends upon a comparison of the facts in the two cases and I conclude that the facts are substantially similar and that the salient characteristics of the *Schlise* rationale, closeness of time and content between interview and mechanical testing, are applicable to the pre-mechanical interview in the case at bar.

---

pre-examination stipulation as required by *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974), was not entered into by the parties.

". . .

"Because we have concluded that the statements made by the defendant to the polygraph operator in their entirety must be excluded from the evidence upon a new trial, the voluntariness of such statements need not be considered except to the extent they may have influenced the subsequent statements given by the defendant to the law enforcement officials." *Schlise, supra*, 86 Wis.2d at 41, 42, 44.

In the instant case the interview preceded the mechanical testing which was scheduled but never given.[2] Whether the interview is pre-mechanical or post-mechanical should make no difference to the result of the case. Admission or exclusion under *Schlise* depends not on whether the interview precedes or succeeds the mechanical testing but on whether the interview and mechanical testing are "one unified procedure." *Schlise, supra,* 86 Wis.2d at 43. In *Schlise* the court, relying on the polygraph examiner's (Anderson's) testimony, recognized that the post-mechanical interview is part of the polygraph examination. *Schlise,* 86 Wis.2d at 42, 43. If we are to rely again on Anderson's testimony, we must conclude that the pre-mechanical interview is an integral part of the polygraph examination. The exchange between defense counsel and Anderson at the trial reveals that Anderson in the instant case considered the "mechanical" test and the preceding interview to be two parts of one unified procedure. Anderson testified in the instant case that "there's no way you can separate the pretest interview from the examination and the posttest examination, they are all one." (Transcript p. 327) In *Schlise* the court said "The 'mechanical' part of the test was preceded by a lengthy pre-test interview assumed by all parties to be part of the polygraph examination." *Schlise,* 86 Wis.2d at 42–43.

In both *Schlise* and in the instant case the defendant assumed that the interview was part of the polygraph examination. In both *Schlise* and in the instant case Anderson shared and confirmed defendant's assumption that the interview was part of the mechanical test.

---

[2] The only way we can say the April 4 interview was a post-mechanical interview is to consider it as coming after the March 7 or March 17 polygraph tests. The defendant does not so argue, and neither do I. It is interesting to note, however, that Anderson did consider the April 4 interview as a continuation of the March 17th testing. Anderson testified: "This [April 4] is a continuation of an examination, not a new examination." Transcript p. 325.

This case, like *Schlise,* is distinguishable on its facts from *Turner v. State,* 76 Wis.2d 1, 250 N.W.2d 706 (1977), and *McAdoo v. State,* 65 Wis.2d 596, 223 N.W.2d 521 (1974). In the *Turner* case Turner took an inconclusive polygraph test with Anderson and then, six days later, refused to take a second test. After refusing the second test, Turner nevertheless agreed to talk with Anderson and confessed. In the *McAdoo* case "the interview [with Anderson] followed the test almost directly. However, this court in *McAdoo* at 603, made the specific determination that it appeared from the record that the test was over, that defendant was informed the test was over, and that he was freely conversing with the examiner." *Schlise,* 86 Wis.2d at 42. Turner's and McAdoo's interviews with Anderson were discrete from the polygraph and those defendants knew Anderson's questioning was not part of the mechanical test. Schlise's and Barrera's interviews with Anderson were related to a mechanical test and the defendants thought the interview was part of the test.

The majority opinion apparently takes the position that because the mechanical test was never given on April 4, the April 4 interview cannot be viewed as having a close association in time and content with a mechanical test. The majority's conclusion that the April 4 interview was "discrete" and separate from a mechanical test is contradicted by the record. Anderson testified that the interview he conducted with the defendant on April 4 was an integral part of the polygraph test that the defendant had agreed to take and that Anderson had agreed to give. Anderson, the defendant and defense counsel all considered the interview a part of the mechanical test. Had the mechanical test been given on April 4 it is clear that under *Schlise* the pre-mechanical interview, the first step of and an integral part of the mechanical test, could not be admitted in evidence.

That the defendant was not given the mechanical test does not change the character of the pre-mechanical interview. The pre-mechanical interview in the instant case was a scheduled part of a polygraph examination and must be treated as such. Neither the rationale of *Schlise* nor the facts in this case provides a basis for distinguishing the *Schlise* case from this case. I conclude that the pre-mechanical interview, being an integral part of a polygraph examination, is inadmissible in the absence of a *Stanislawski* stipulation.

If the majority view is correct that Anderson's April 4 interview was an interrogation, separate and distinct from the mechanical polygraph test, I would exclude Anderson's testimony on state and federal constitutional grounds.

Despite Anderson's testimony as to the unity of the pre-mechanical interview with the mechanical examination, there is sufficient evidence in the record from which to conclude that Anderson, having given two prior inconclusive polygraph tests, had no intention of giving the defendant another polygraph examination on April 4 and that Anderson intended to use his time alone with the defendant to obtain a confession. The trial court, having heard the tape of the Anderson interview, recognized the interrogatory nature of Anderson's interview, commenting "Now it's true that the examination has more of the appearance on tape of police interrogation than it has by way of preparation for a polygraph examination . . . ." Although the tape is not part of the record in this court, the transcript of proceedings before the trial court gives us a flavor of the interview and supports the trial court's characterization of the interview as an interrogation, not a pre-mechanical interview. Defense counsel elicited the following testimony from Anderson which showed Anderson's intent to get a confession:

*"Q.* [Counsel] I understand that but during that 45 minutes that you were with Mr. Barrera were you preparing for the test or were you trying to obtain a confession?

*"A.* [Anderson] I was setting the proper psychological set for the examination of Mr. Barrera. Before I started that test I wanted Mr. Barrera to be aware of what Mr. Garcia's examination results were.

*"Q.* Did that take 45 minutes to explain too?

*"A.* Once I made him aware of it I could sense Mr. Barrera was in the position of being ready to confess and I pursued that.

*"Q.* Isn't that a kind of subterfuge then that's worked upon the defendant and his attorney when we think we are going to be prepared for and administered a polygraph test and yet in your mind that isn't the case at all?

*"A.* That's not true. I came here to administer a polygraph examination to Mr. Barrera. I also came here to [elicit] a confession from him if Mr. Barrera was untruthful." (Transcript pp. 328–29.)

Anderson's use of the April 4 interview to obtain a confession was duplicitous. Anderson, after having conducted two examinations, suggested the third examination (Transcript p. 325). Defendant and defense counsel agreed to a third examination. They had every reason to think that a third polygraph examination would be conducted in a manner similar to the other two.

The first two tests had been conducted in Madison. Defense counsel watched both testings through two-way mirrors and could have interrupted the tests by tapping on the window. The April 4 interview was conducted in Juneau, and counsel could not view the test. There was no two-way mirror and Anderson testified that he would not allow counsel in the testing room during the interview or test.[3] On April 4 counsel had to trust the

---

[3] *"Q.* [Defense Counsel] And one of your comments to me before the first one was if I recall correctly, if you want to interrupt this interview at any time you rap on the glass, isn't that true?

examiner to conduct the examination as he had in the past and in the manner which had been previously explained to the defendant and counsel.

Prior to the other tests Anderson had explained to the defendant and the defense counsel various facets of the pre-mechanical interview and the test. Anderson testified in this case that he had explained the significance of the pre-test interview to defendant and counsel and had conducted pre-test interviews with the defendant in the March 7 and March 17 polygraph sessions. Although part of Anderson's pre-test interview is, as he testified, "obtaining . . . admissions or full confessions," Anderson further testified that he had not explained this facet of the pre-mechanical interview to the defendant or defense counsel. I cannot help but wonder whether it is proper for a polygrapher to interrogate the subject in a pre-mechanical interview to obtain a confession if the polygrapher's goal is to obtain a valid mechanical test. Reid and Inbau, in their text *Truth and Deception: The Polygraph ("Lie-Detector") Technique* (1966), disavow the use of a pre-mechanical interview to obtain a confession, explaining:

*"At no time during the pretest interview should the examiner indulge in any interrogation aimed at determining the subject's deception or truthfulness, or at obtaining a confession of guilt.* The only exception to this rule is where the subject clearly evidences a desire to confess before the test.

"A subject who is accused by the examiner of committing the act or offense under investigation, or who

---

"*A.* [Anderson] That's correct.

"*Q.* Didn't have that opportunity here? You didn't allow me to remain in the room?

"*A.* No, I would not allow anyone to remain in the room during the polygraph testing.

"*Q.* But had we had the proper facilities I would have had the opportunity to rap on the window and stop the examination when I thought it ought to be stopped?

"*A.* Right." (Transcript p. 334.)

is interrogated as though he is already considered responsible for it is no longer a suitable subject for a polygraph test by that examiner. If he is a truthful subject, he may become so disturbed by the accusation or interrogation that he will display deception reactions on the test or else the Polygraph tracings will be too distorted to permit a diagnosis of deception or truthfulness.

"Throughout the pretest interview the examiner's attitude should be completely objective and noncommital; he must be thoroughly impartial as to the subject's deception or truthfulness. To adopt any other attitude will place the examiner in the role of an interrogator rather than that of interviewer and examiner. Only *after* the test is completed, and only *after* the results have indicated deception, should the examiner embark upon any form of accusation or interrogation for the purpose of obtaining an admission." *Id.* at 11–13. (Emphasis in original.)

In any event, on April 4 the defendant had come to talk to Anderson in connection with a polygraph test, not to participate in a general interrogation outside the presence of defense counsel. On April 4, prior to the interview, the defendant signed a Crime Laboratory Bureau standard printed form entitled Statement of Consent. By signing the statement the defendant acknowledged that Anderson, a polygraph examiner of the Crime Bureau, was to administer a polygraph examination, that he had been read his *Miranda* rights, that he agreed to answer questions without an attorney present, that Anderson had explained the nature of the polygraph examination and that he was consenting to a polygraph examination.

Under the guise of administering a polygraph test, Anderson, an experienced polygraph operator, interrogated the defendant alone in a closed room. The operator deliberately engaged in a game of disguised objective. The operator was in control; he apparently tightened and loosened his tentacles seeking to solicit

defendant's admission of guilt and to avoid the defendant's cry for counsel.[4] Anderson obviously had no intention of giving a third polygraph examination that might prove inconclusive. Anderson's goal was a confession, the defendant's own incriminating words which Anderson would deliberately elicit outside the presence of counsel. The defendant was thus questioned in a manner and for a purpose contrary to the agreement of defendant and defense counsel.

I find it difficult to reconcile this court's condoning the questioning in the instant case with the state and federal constitutionally guaranteed right to counsel. I believe the questioning in the instant case is condemned by *Brewer v. Williams,* 430 U.S. 387, 397–401 (1977), as a denial of the right to counsel. The defendant placed his trust in his lawyers who in turn placed their trust in the Wisconsin law enforcement authorities who agreed to conduct a polygraph examination, not to conduct an interrogation to elicit a confession outside the presence of counsel. "If, in the long run we are seriously concerned about the individual's effective representation by counsel, the State cannot be permitted to dishonor its promise to this lawyer." *Brewer v. Williams, supra,* 430 U.S. at 415 (J. Stevens concurring). *See* White, *Police Trickery in Inducing Confessions,* 127 U. Pa. L. Rev. 581, 602–608 (1979).

I also find it difficult to reconcile this court's condoning the questioning in the instant case with basic concepts of fair play, that is, with the basic concepts of due process. Convicting the guilty is of utmost importance but so is maintaining respect for and public

---

[4] Anderson used techniques recommended in police manuals as effective interrogation methods, *e.g.,* displaying understanding and sympathy by gestures as a pat on the body while urging the defendant to tell the truth and appealing to the defendant's sense of morality and discussing God and religion if the defendant is religious. *See* Inbau & Reid, *Criminal Interrogation and Confessions* 59–61 (2d ed. 1967).

confidence in our government.[5]  Citizens should be able to rely upon government officials to abide by their word and to behave fairly.  Defendant's and defense counsel's understanding with the government in this case was that a polygraph examination would be administered.  The government should be held to its word.  The government's breach of its agreement in this case violates due process.

For the reasons set forth, I would affirm the decision of the court of appeals on the issue of the polygrapher's testimony.

I am authorized to state that Justice Nathan S. Heffernan joins in this dissent.

---

[5] Professor Inbau, a staunch advocate of effective police interrogation and an opponent of court rules which unduly tie the police's hands in the war against crime, said in a speech to police officers:

"Too often there is the tendency on the part of the police to criticize all that the courts do—to label as technicalities the reasons given for any particular case decision that the individual police officer dislikes.  There are times, to be sure, when that is true.  But there are many times when the reasons are substantial and basically valid . . . .

"As a police officer you may feel that the courts should leave you alone in your efforts to enforce the law, to apprehend criminals and to protect the public.  Many courts would also like to be left alone to do as they please.  Many legislators would also like to be left alone and unchecked.  Many members of the executive branch . . . would also like to function as they please.  But in a democratic system, no branch of government, can be permitted to exercise unbridled authority and power. . . .

"In any democratic society individual rights and liberties must be preserved and we are willing to do so at the expense of efficiency in government itself.  To relate this principle to your situation, let me put it this way.  We would rather that some criminals escape detection and punishment—even though you, as a police officer, know positively he is guilty—rather than sacrifice or even jeopardize the rights and liberties of the great mass of individuals who make up this democratic society of ours.  This concept is essential. *It is different in Russia, of course.  There, efficiency is paramount* [emphasis added]."  Inbau, unpublished

address at Willamette College of Law, Salem, Ore., reprinted in Kamisar, *Fred E. Inbau: "The Importance of Being Guilty"*, 68 J. Crim. L. & C., 182, 193 n. 68 (1977).

