STATE, Respondent, v. KUTA, Appellant.

*No. State 55. Argued May 6, 1975.—Decided June 3, 1975.*
(Also reported in 229 N. W. 2d 580.)

For the appellant there was a brief and oral argument by *Marshall Arrieh* of Milwaukee.

For the respondent there was a brief by *Bronson C. La Follette,* attorney general, and *James H. Bailey* and *James H. McDermott,* assistant attorneys general, and oral argument by *William L. Gansner,* assistant attorney general.

WILKIE, C. J.   The principal issue on this appeal is whether the evidence supports the verdict finding the appellant-defendant, Richard Denis Kuta, guilty of endangering safety by conduct regardless of life in violation of sec. 941.30, Stats.   Following his conviction, Kuta was sentenced to three years' imprisonment.   We affirm the judgment of conviction and the order denying post-verdict motions.

Viewing the evidence in the light most favorable to the jury verdict, the incident underlying the conviction here can be described as follows: At approximately 10 p.m. on November 14, 1973, in Milwaukee, two policemen, Jerome Dittman and Michael La Pointe, went to Kuta's residence to speak to him concerning a complaint involving "neighbor troubles" filed earlier that day.   Dittman knocked on the door which then swung abruptly open, revealing the defendant standing in the doorway.   The two officers testified that defendant was holding a cocked pistol in his right hand pointed directly at La Pointe's stomach, and less than two feet away.[1] The officers testified that no words were spoken by them or the defendant, and that after hesitating a few

[1] One officer testified that he first saw the gun when he retrieved it from the floor, but later clarified this statement by saying he saw the gun first in the defendant's hand but did not get a close look at it until retrieving it.

seconds (one officer said ten to fifteen seconds, the other said three to four seconds), they rushed defendant, grabbed him, and then ordered him to drop the gun. Kuta testified that before the officers rushed him, one said "The son of a bitch has a gun." In the short struggle that ensued the gun ultimately shook loose from Kuta's hand and fell to the floor. It was a fully loaded .38-caliber two-shot Roman derringer.

Kuta operated a scrap metal business from his residence, and he testified that while in his basement alone, cleaning tools, his three dogs started to bark and on going upstairs to investigate he heard what sounded like a knock at the side door. He testified that when he opened the door he immediately saw the two policemen. Kuta acknowledged that he had the loaded gun when the door was opened, but the testimony of Kuta and the two officers was in sharp dispute about whether he had the gun in hand as the officers testified.

Crucial to the conviction was the testimony of Officer La Pointe about an incident that occurred approximately two months previous to the incident for which the defendant was charged and convicted. Officer La Pointe testified, over defendant's objection, that he and another officer were checking garages in the area in the course of an investigation when they started to inspect one of defendant's garages. At that point, according to Officer La Pointe:

". . . Mr. Kuta leaped over a back fence, came running up to our squad car, and began yelling at us, What the hell do we think we were doing? We told him we were conducting an investigation. He said, 'You stay the hell away from my property. The next time you see me I'll be armed and, if I see you or any cop or anybody else on my property, I'll defend myself and I'll kill you.'"

The first question presented here is whether the trial court abused its discretion in permitting Officer La Pointe's testimony concerning Kuta's prior threat to kill

intruders on his property. We conclude that there was no abuse of discretion in admitting this testimony.

The crime charged has three elements: (1) The defendant's conduct was imminently dangerous to another, (2) the defendant's conduct evinced a depraved mind, regardless of human life, and (3) the safety of another was actually endangered by the defendant's conduct.[2] The evidence concerning the prior incident was obviously intended to show that the defendant's conduct "evinced a depraved mind, regardless of human life" or "was imminently dangerous to another."

Although it is well established that evidence of past conduct may not be introduced to show that the defendant acted in conformity with that misconduct, it may be admissible for other purposes, for example, to show the defendant's state of mind.[3] In *Whitty v. State*,[4] the court held that the question of admissibility of evidence of prior crimes turns upon whether the probative value of the evidence outweighs the risk that its admission will consume excessive time, confuse or unduly prejudice the jury, or unfairly surprise the defendant.

*Whitty* and subsequent cases recognize Rule 303 of the American Law Institute Model Code of Evidence. This rule has largely been incorporated in sec. 904.04 (2), Stats., of the new Wisconsin Rules of Evidence. The crucial question on the admission of evidence such as this is whether there is an abuse of discretion on the part of the trial court in admitting the evidence. Here the trial court clearly applied the proper factors and in its judgment ruled that the evidence of the threat by Kuta had some relevance to the question of whether Kuta acted with a depraved mind approximately two

[2] *State v. Dolan* (1969), 44 Wis. 2d 68, 73, 170 N. W. 2d 822.

[3] *Werner v. State* (1975), 66 Wis. 2d 736, 744, 226 N. W. 2d 402.

[4] (1967), 34 Wis. 2d 278, 294, 149 N. W. 2d 557, certiorari denied, 390 U. S. 959, 88 Sup. Ct. 1056, 19 L. Ed. 2d 1155.

months later, and that the value of the evidence out-weighed any risk connected with its admission. We agree.

As the court said in *Whitty*, the probative value of evidence of prior misconduct "depends in part upon its nearness in time, place and circumstances to the alleged crime or element sought to be proved."[5] Here, the elements of place and circumstance, while not identical, are similar. In the first incident the police officers were apparently inspecting defendant's garage without his permission, while in the second, the officers merely came to his door. However, the threat reveals defendant's general willingness to kill anyone, especially a policeman, whom he feels is an intruder on his property. We conclude that the trial court properly admitted evidence concerning the threat.

This brings us to the major consideration of whether the evidence does support the conviction for "endangering safety by conduct regardless of life." There is no question that pointing a loaded gun at another person endangers his safety, thus fulfilling the third element of sec. 941.30, Stats. The other elements indicating that Kuta's conduct was "imminently dangerous" and "evinced a depraved mind regardless of human life" are also supported by the evidence. The gun was fully loaded and fully cocked, ready to fire, and pointed at close range directly into the stomach of one of the officers. When the door opened and defendant saw the officers standing there, he did not drop or lower his gun; the officers were only able to wrest the weapon from his hand during the course of a struggle. These facts, coupled with the crucial evidence concerning defendant's express threat to kill of two months before, show that his conduct was "imminently dangerous" and evinced a "depraved mind, regardless of human life."[6]

---

[5] *Id.*

[6] *State v. Weso* (1973), 60 Wis. 2d 404, 210 N. W. 2d 442.

In *State v. Weso,*[7] defendant slashed his victim across the face in the course of a fight. In discussing in detail the kind of conduct that evinces a "depraved mind" the court said:

". . . The mind must not only disregard the safety of another but be devoid of regard for the life of another. . . . 'Depraved' as a verb means to pervert and as an adjective it means 'marked by debasement, corruption, perversion, or deterioration.' Webster's, *International Dictionary* (3d ed.). Certainly a depraved mind is not the normal state of mind of a reasonable person. A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment. A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm. Weso's argument that he intended only to frighten Martin is invalid."[8]

Most convictions under sec. 941.30, Stats., that have been described in this court's opinions have involved overt acts of a defendant akin to attempts to commit first-degree murder, but where no serious harm actually resulted from the conduct. In *State v. Cassel*[9] and *State v. Melvin*[10] the defendants resisted a police officer's command to stop and a gun battle ensued with the defendants actually firing one or more shots. In *Bednarski v. State*[11] the defendant was driving his car at night without lights in the city of Milwaukee, failed to stop when approached by three police cars, and during the ensuing chase intentionally rammed into a police motorcyclist. In *State v. Van Ark*[12] the defendant planted a bomb capable of exploding and intended to

[7] *Id.*

[8] *Id.* at pages 411, 412.

[9] (1970), 48 Wis. 2d 619, 180 N. W. 2d 607.

[10] (1970), 49 Wis. 2d 246, 181 N. W. 2d 490.

[11] (1972), 53 Wis. 2d 791, 193 N. W. 2d 668.

[12] (1974), 62 Wis. 2d 155, 215 N. W. 2d 41.

explode in the neck of an automobile gas tank, although the bomb did not actually go off.

Although all of these cases, *Cassel, Melvin, Bednarski* and *Van Ark,* where the defendants were convicted of violating sec. 941.30, Stats., involved overt acts which themselves caused or were capable of causing bodily harm, there have been at least two recent convictions where overt acts were not involved but where life-endangering acts were involved which were merely threatened. Thus, in *Kwosek v. State*[13] the defendant who had been having sexual relations with the victim's wife, entered the victim's home, detained him at gunpoint for two hours in an upstairs bedroom and said he was going to kill him. This court said:

". . . Evidence of his entering the premises under the circumstances of this case, armed with a gun, aiming it at a person and stating he was going to kill him is sufficient to establish a depraved mind within the meaning of the statute."[14]

The defendant was convicted of both endangering safety by conduct regardless of life, and false imprisonment, and both convictions were affirmed.

In *State v. Dolan,*[15] defendant held a butcher knife in his hand and chased a Mr. Hoff into a tavern. A Mr. Hering tried to calm defendant who then told Hering to "butt out" and poked him in the stomach with the knife. Hering grabbed the knife from defendant's hand, whereupon defendant knocked Hering to the ground, grabbed another knife lying nearby, held it to Hering's throat and said, " 'Give me my knife back or I will cut your throat.' "[16] This court affirmed defendant's conviction

[13] (1973), 60 Wis. 2d 276, 208 N. W. 2d 308.
[14] *Id.* at pages 280, 281.
[15] (1969), 44 Wis. 2d 68, 170 N. W. 2d 822.
[16] *Id.* at page 71.

under sec. 941.30, Stats. The court said that the general intent to harm as well as the elements of depravity and imminent danger could be inferred from defendant's aggressive conduct and speech.

Here, Kuta not only endangered the safety of the police officers by pointing a loaded gun at them, but evinced a depraved mind under conditions supporting the conclusion that "the safety of another was actually endangered" by Kuta's conduct.

Without citing any authority, defendant argues his conduct was privileged because:

". . . Even if he had his gun out and was pointing it ahead of him, as he peered out of his doorway, there is no law prohibiting a citizen to carry a gun and investigate any possible intrusion on his private property, and countless of citizens have done so ever since the founding of the republic."

First it must be pointed out that defendant was not charged with unlawful possession of a weapon. Second, the question whether defendant acted reasonably based upon a reasonable belief that his person or property was threatened with unlawful interference is a question of fact to be determined by the jury based upon the law contained in the self-defense statutes, secs. 939.48[17]

---

[17] Sec. 939.48, Stats., provides in part:

". . . Self-defense and defense of others. (1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person. The actor may intentionally use only such force or threat thereof as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death or great bodily harm unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

and 939.49.[18] Defendant never requested a self-defense instruction at trial and is not claiming, in his appeal brief, that such an instruction should have been given. Rather he is apparently asking the court to find his conduct privileged as a matter of law. However, since this is a question of fact that should be resolved by a jury, such a holding would be inappropriate.

We have considered the pro se arguments of the defendant, claiming denial of statutory right to a speedy trial, denial of bail, lack of probable cause for arrest, alleged perjured testimony by prosecution witnesses, and ineffectiveness of counsel. We conclude that each of these contentions is without merit.

*By the Court.*—Judgment and order affirmed.

---

[18] Sec. 939.49, Stats., provides in part:

". . . **Defense of property and protection against shoplifting.** (1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his property. Only such degree of force or threat thereof may intentionally be used as the actor reasonably believes is necessary to prevent or terminate the interference. It is not reasonable to intentionally use force intended or likely to cause death or great bodily harm for the sole purpose of defense of one's property."