HAMMEN, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76–710–CR.  Argued November 1, 1978.—*
*Decided February 27, 1979.*
(Also reported in 275 N.W.2d 709.)

792

For the plaintiff in error there was a brief by *Howard B. Eisenberg,* state public defender, and oral argument by *Robert Paul,* deputy state public defender.

For the defendant in error the cause was argued by *Maryann S. Calef,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

WILLIAM G. CALLOW, J.   Terry Hammen was convicted after a jury trial of injury by conduct regardless of life in violation of sec. 940.23, Stats.[1] The issues on review are whether it was prejudicial error to allow testimony about the defendant's drug dealing before and after the offense and to permit two photographs of the victim's wounds to go to the jury room. Concluding there was no error, we affirm.

A complaint was issued on August 10, 1976, alleging the defendant caused great bodily harm to Linda Olson in violation of sec. 940.23, Stats., by beating and slashing her three days earlier. Following the bindover, the defendant pleaded not guilty and was released on bail. The jury found the defendant guilty November 19, 1976.

Testimony revealed that at about 3:45 a.m. on August 7, 1976, Linda Zimmerman and her boyfriend returned to their apartment on East Dayton Street in Madison. They shared the apartment with five persons. They discovered

---

[1] "940.23 **Injury by conduct regardless of life.** Whoever causes great bodily harm to another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not more than 10 years."

blood in the living room and found one of their room-mates, Linda Olson, in a bedroom in an apparent state of shock. Olson gave the names "Terry" and "Tim" and said, "It's someone we all know." The police and fire rescue squad arrived between 4:20 and 4:35 a.m. They found Olson lying naked on a bed, wrapped in covers, with bruises and cuts over her face and body. She said, "Terry did it," and "[H]e tried to strangle me." There were several pools of what appeared to be blood on the floor and sofa in the living room; blood was smeared on the wall leading to the bedroom where Olson was found. On the floor of the living room there were items of women's clothing and a broken bottle with blood and hair on it.

The physician who treated Olson at the hospital testified that she was in shock and had suffered facial injuries, contusions, bruising, and swelling. On his initial examination he found that she had multiple fractures of the facial bones and extensive lacerations of her chest, abdomen, back, right arm, and left leg. She had a bruise on the lower part of her neck, and lost four pints, or about 25 percent, of her blood. There was no evidence of sexual intercourse. The court admitted, over objection, four photographs of Olson's injuries, noting that they were received as proof of great bodily harm and that no sympathy or prejudice was to be drawn from them. The doctor testified, finally, that a sharp, heavy instrument probably caused the wound and that without treatment Olson would have had serious facial disfigurement.

A police officer testified that at around 12:45 a.m. on August 7, 1976, he saw the defendant near a car at the intersection of Atwood Avenue and Winnebago Street in Madison. He complained that the parties in the car struck him, and he asked the officer to pursue them. The officer examined him and found no injury. By that time the car was gone. Commenting that he had waited for a bus since 11 p.m., the defendant asked the officer for a ride

uptown. The officer refused because he was going in a different direction.

Dwight Greve testified that he returned to his apartment on Pinckney Street around the corner from the Olson apartment with a friend, Jill Whaples, between 1:30 and 1:45 a.m. on the morning of August 7, 1976. As they were climbing the stairs to the apartment, the defendant and a companion approached from the rear, asked for a person named Frank, and then offered to sell Greve some hashish. Greve said that the defendant was shoving his companion up the stairs. The defendant told Greve that the fellow had "ripped [him] off thirty three thousand dollars worth of coke." As the conversation ended, the defendant told his companion that if he ran he would shoot him. Whaples remembered that the defendant and another person had a conversation with Greve on the stairway to Greve's apartment on the morning of August 7.

William Augustyn lived in the apartment downstairs from Olson's at the time in question. He testified that between midnight and 1:00 a.m. on the morning of August 7 he saw the defendant, whom he had met three weeks earlier, and another man pacing back and forth in front of his window. Between 2:15 and 3 a.m., Augustyn, who was watching a late movie, heard "wrestling noises," moaning, and sounds of glass breaking upstairs. He was not concerned because he assumed people were "goofing around." Around 2:45 or 3 a.m., Augustyn saw someone whom he thought to be the defendant leave and "turn the corner around the stairs." Augustyn testified that three or four weeks before the trial the defendant asked him on the street, before recognizing him, if he wanted to buy cocaine. Defense counsel objected and moved for a mistrial. The court denied the defendant's motion for a mistrial and instructed the jury to disregard the statement. Augustyn testified that after the defendant re-

alized who Augustyn was, he said if Augustyn was thinking of testifying, he "might end up getting . . . hurt."

Linda Olson, who was twenty-four at the time of the attack, testified that she was working on a paper in the early morning hours of August 7, 1976. No one else was home. Someone knocked on the door around 1:30 or 2 a.m., identified himself as Terry, and asked for one of Olson's roommates. When she told him that the roommate was gone, he said he needed someone to talk with. Olson identified the defendant, whom she had met on a few occasions before August 7, as the person she let into the apartment that night. They sat on the couch and talked for at least twenty minutes. The defendant did not appear to be intoxicated. He asked Olson if she would go to bed with him. She ignored him. As she was looking the other way, he grabbed her throat and strangled her. She lost consciousness. Her next memory is of the hospital. Olson testified that she remained in the hospital's intensive care unit four days. She said that she had wounds over most of her body, except for her legs and left arm, and that her jaw had to be wired.

The defendant's mother testified that she was tending bar at a tavern on Atwood Avenue in Madison on the evening of August 6. She said the defendant was in the bar until 1 a.m., drinking and playing pool and pinball. The defendant and his mother left the bar together. She went home where she lived with her husband and the defendant. She thought the defendant was going to a restaurant. The defendant's stepfather testified that he was awakened by the defendant and let him in the house a little after 2:30 a.m. on August 7. He noticed nothing unusual about him. The owner of the bar at which the defendant's mother was working testified that the defendant was at the bar drinking and playing pool from 6 p.m. the evening of August 6 until 1 a.m., August 7.

The defendant, age twenty-five, testified that he was at the bar on Atwood Avenue until 1 a.m. As he was on his way to get something to eat, he met a girl on the street. They talked and smoked marijuana for fifteen or twenty minutes. He went directly home, arriving about 2 a.m. The defendant testified that the meeting with Greve took place not on the night of Olson's attack but the evening before. He denied attacking Linda Olson.

Following instructions, the court, over objection, sent two of the photographs of Olson's wounds to the jury room. The pictures were 8″ × 10″ color, glossy photos showing the bruises and scars on Olson's face and back.

The jury found the defendant guilty. Judgment of conviction was entered December 1, 1976. The court denied the defendant's motion for a new trial on April 8, 1977. The defendant seeks review by writs of error of the judgment and order denying the motion for a new trial.

There are two questions presented: (1) Was it prejudicial error to allow testimony about the defendant's drug dealing before and after the offense? (2) Was it prejudicial error to permit two photographs of the victim's wounds to go to the jury room?

The defendant argues that it was prejudicial error to allow testimony about the defendant's drug dealing before and after the offense occurred. Sec. (Rule) 904.04 (2), Stats., provides as follows:

"OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

This court thoroughly discussed the application of the other-conduct rule in *State v. Spraggin,* 77 Wis.2d 89,

94–95, 252 N.W.2d 94 (1977). Observing that the general rule is to exclude such evidence where it is offered to show criminal disposition, the court quoted from *Whitty v. State*, 34 Wis.2d 278, 292, 149 N.W.2d 557 (1967), *cert. denied* 390 U.S. 959 (1968), as follows:

" 'The character rule excluding prior-crimes evidence as it relates to the guilt issue rests on four bases: (1) The overstrong tendency to believe the defendant guilty of the charge merely because he is a person likely to do such acts; (2) the tendency to condemn not because he is believed guilty of the present charge but because he has escaped punishment from other offenses; (3) the injustice of attacking one who is not prepared to demonstrate the attacking evidence is fabricated; and (4) the confusion of issues which might result from bringing in the evidence of other crimes.' "

Where the evidence in question properly falls within one of the exceptions to the rule, the trial court must exercise its discretion to determine whether any prejudicial effect of the evidence outweighs its probative value. *See:* sec. (Rule) 904.03, Stats.

The trial court admitted Greve's testimony that early on August 7, 1976, the defendant offered to sell him hashish, made mention of a cocaine deal, and then threatened to shoot his companion. In allowing this testimony, the trial court stated that the evidence of events happening so close in time to the offense was probative of the defendant's state of mind.

One of the elements of the crime of injury by conduct regardless of life is that the act evince a depraved mind. Sec. 940.23, Stats. Evidence of prior conduct may, under the proper circumstances, be admissible to show that the defendant's acts evinced a depraved mind. *State v. Kuta,* 68 Wis.2d 641, 644–45, 229 N.W.2d 580 (1975). In *Kuta* the defendant was charged with endangering safety by conduct regardless of life contrary to sec. 941.30,

Stats. The charge arose out of allegations that the defendant pointed a gun at two police officers who came to his door. The defendant argued on appeal that the trial court abused its discretion in allowing one of the officers to testify that two months before the incident in question Kuta threatened to kill two policemen if they came onto his property again. The trial court ruled that the testimony was relevant to the question of whether Kuta acted with a depraved mind and that the value of the evidence outweighed any possible prejudicial effect. This court affirmed, stating that "the threat reveals defendant's general willingness to kill anyone, especially a policeman, whom he feels is an intuder on his property." 68 Wis.2d at 645. Because the threat was closely related in place and circumstance to the facts underlying the charge, it had substantial probative value. *Id.*

In this case the prior conduct is closely related to the offense charged in time, place, and substance. Greve testified that at the end of the conversation about drugs the defendant threatened to shoot his companion. This testimony is relevant. to a showing that the defendant acted with a depraved mind, one of the elements of sec. 940.23, Stats. Though the error complained of is the offer to sell hashish, that portion of the conversation is not severable from the threat because it deals with an integrated event. The testimony thus fits within an exception to the general rule against other-conduct evidence.

The trial court made no explicit determination that the probative value of the evidence was not outweighed by its possible prejudicial effect. In deciding whether to allow other-conduct evidence, it is not enough that the evidence fall within one of the exceptions to the other-conduct rule; the trial court must also exercise its discretion to determine whether any prejudicial effect of the evidence outweighs its probative value. *Spraggin, supra,* 77 Wis.2d

at 100; *Kwosek v. State,* 60 Wis.2d 276, 282, 208 N.W.2d 308 (1973). This determination was probably implicit when the trial court, in ruling on the defendant's objection, stated, "You have already put the girl smoking pot and so on." This seems to represent the trial court's assessment that the receipt of the testimony at issue could not have much prejudicial effect in view of the entire record. In any event, this court will uphold a discretionary decision of the trial court if the record contains facts which would support the trial court's decision had it fully exercised its discretion. *Klimas v. State,* 75 Wis.2d 244, 247, 249 N.W.2d 285 (1977). On this record any danger of prejudicial effect of the testimony clearly does not outweigh its probative value.

The defendant also argues that it was error to allow Augustyn's testimony that the defendant offered to sell him cocaine three or four weeks before the trial and thus after the date of the offense. The defendant objected to testimony of the encounter between the defendant and the witness before the testimony was elicited. The record does not show that the trial court knew specifically that there would be testimony of an offer to sell cocaine. Immediately after that statement, the defendant objected and moved for a mistrial. The court instructed the jury to disregard the reference to the defendant's offer to sell cocaine. The record is as follows:

"*Q.* Where did you see Mr. Hammen?
"*A.* He approached us on State Street from behind.
"*Q.* Did he say anything to you?
"*A.* First thing he said before he had seen our faces was he asked if any of us wanted to buy cocaine.
"*By Mr. Burke:* Your Honor, I would raise an objection to this. I renew my objection and move for a mistrial.
"*By the Court:* Your motion is denied and the jury is instructed to disregard that testimony about that part of the conversation because it is not germane to the case.

The conversation about whether he wanted to pass the time of day and so forth is not germane and therefore the jury is instructed to disregard that."

The defendant characterizes this ruling as ambiguous since there was no testimony about wanting to pass the time of day. The state points out, however, the court's unusual choice of language was probably an attempt to lessen the impact of the witness's reference to cocaine. The transcript clearly demonstrates that the jury was instructed to disregard the testimony, and the trial court properly attempted to de-emphasize the objectionable testimony by this choice of language in the admonition. Upon this record the trial court properly overruled the motion for a mistrial.

We observe that even if admission of the testimony at issue were considered error, we would be compelled to find it harmless under any test. *State v. Jennaro,* 76 Wis.2d 499, 509–10, 251 N.W.2d 800 (1977); *Wold v. State,* 57 Wis.2d 344, 356–57, 204 N.W.2d 482 (1973). The testimony could not have had more than a slight effect on the jury's verdict.

The defendant admitted smoking marijuana as part of his alibi. He testified he had been convicted of a crime nine times. While this is a one-on-one confrontation, the victim charging that the defendant committed the attack and the defendant denying it, there was strong evidence of the defendant's guilt. From the outset she identified "Terry," a person she knew, as the attacker. She picked him out of a lineup two days after the attack. She had a conversation of at least twenty minutes with him before the incident. Witnesses placed the defendant in the vicinity of the crime on the morning of August 7.

The defendant argues that it was prejudicial error to allow two photographs of Olson's wounds to go to the jury room. One of the 8″ × 10″ color, glossy photographs shows Olson's facial injuries; the other shows several

scars on her back. When admitting the photographs into evidence on the first day of the three-day trial, the court noted that they were being viewed only to show the nature of the injuries and that no sympathy or bias was to be drawn from them. The court refused to send to the jury room two of the four photographs received, stating that one did not add anything and that the other was inflammatory.

Whether photographs are to be sent to the jury room is a matter of the trial court's discretion. *Simpson v. State,* 83 Wis.2d 494, 505–06, 266 N.W.2d 270 (1978); *Hayzes v. State,* 64 Wis.2d 189, 198–200, 218 N.W.2d 717 (1974); *Neuenfeldt v. State,* 29 Wis.2d 20, 32, 138 N.W.2d 252 (1965). In *Neuenfeldt* the court said: "It is discretionary with the trial court to admit photographs to aid the jury in securing a clear idea of a material situation when the photographs better show that situation than does the testimony of witnesses." *Id.* at 32–33.

In *Hayzes,* a first-degree murder case, the trial court allowed the jury to see color photographs showing portions of the victim's head and body and a bloodstained car seat. This court, noting that the photographs were somewhat cumulative of certain testimony, nonetheless agreed with the trial court that the photographs more clearly showed the nature of the wound and the bullet's trajectory than did the pathologist's testimony. The court said:

"The trial judge properly exercised his discretion according to the standards of *Neuenfeldt, supra.* While reasonable persons looking at the photographs as a part of a record may have differing opinions in regard to whether they were cumulative, inflammatory, or prejudicial, the judgment is essentially one to be exercised by the trial judge. He, better than anyone else, in light of the evidence, can make the determination that the photographs will assist the jury in a rational and dispassionate deter-

mination of the facts. Where a trial judge has applied the appropriate discretionary standards, this court will not reverse his decision unless it appears that, in light of the record as a whole, his conclusion was wholly unreasonable or if the circumstances indicate that the only purpose of the photographs was to inflame or prejudice the jury. The trial judge here did not commit error in admitting the photographs." 64 Wis.2d at 200.

In this case, the trial court's awareness of the appropriate factors for consideration in deciding whether to send the photographs to the jury room was evident in its cautionary instruction and refusal to send the other two photographs to the jury on the grounds that one did not add anything and that the other was inflammatory. The *Hayzes Case* is indistinguishable from this case, and following *Hayzes*, the court's exercise of discretion must here be upheld.

*By the Court.*—Judgment and order affirmed.