STATE of Wisconsin, Plaintiff-Respondent,

v.

Danny Prince HALL, Defendant-Appellant-Petitioner.

Supreme Court

*No. 80–222–CR. Argued June 3, 1981.—Decided June 30, 1981.*

(Also reported in 307 N.W.2d 289.)

For the petitioner there was a brief and oral argument by *Mark Lukoff*, first assistant state public defender.

For the respondent the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

COFFEY, J.   This is a review of a decision of the court of appeals affirming in part and reversing in part a judgment of conviction and an order denying a motion for post-conviction relief entered in the circuit court for Milwaukee county, the Hon. MARVIN C. HOLZ, presiding.  Following a jury trial, the defendant, Danny Hall, was convicted of first-degree murder, attempted first-degree murder, three separate armed robberies, one attempted armed robbery, as well as several other crimes. He was sentenced to a prison term of life plus twenty-five years with credit for pre-trial confinement.  The court of appeals reversed the judgment of conviction and order denying the motion for post-conviction relief for the crime of attempted armed robbery, but affirmed the trial court's convictions of the defendant as to all of the other crimes.

The state does not challenge the appellate court's reversal and dismissal of the attempted armed robbery conviction and therefore that issue is not before us.  This review concerns the defendant's claim that the consolidation of the offenses in one trial dealing with three armed robberies and the attempted armed robbery incidents was improper.

On March 19, 1978, the district attorney filed an information[1] charging the defendant, Danny Hall, with, *inter alia,* twelve criminal offenses arising from three armed robberies that included one murder and one attempted murder and an attempted armed robbery at two gas stations and a White Hen Pantry store located in the north

[1] The information filed on March 19, 1978, amended an information filed on March 2, 1978.

metropolitan Milwaukee county area. All of the crimes occurred between August 25th and September 2, 1978. The crimes charged were as follows: (1) August 25, 1978, the Citgo "Quik Mart" at 1602 East Capitol Drive, Shorewood—armed robbery contrary to sec. 943.32(1)(a) and (2), Stats. 1977, attempted first-degree murder contrary to secs. 940.01 and 939.32, reckless use of a weapon contrary to sec. 941.20(1)(c), carrying a concealed weapon contrary to sec. 941.23(1), Stats. 1977, and injury by conduct regardless of life contrary to sec. 940.23 (counts 1 through 4 and count 12); (2) August 31, 1978, the White Hen Pantry store at 6829 North Teutonia Avenue, Milwaukee (hereinafter White Hen I) —armed robbery contrary to sec. 943.32(1)(a) and (2), Stats. 1977, battery contrary to sec. 940.19(1), and carrying a concealed weapon contrary to sec. 941.23(1), Stats. 1977 (counts 5 through 7); (3) September 1, 1978, the Clark Service Station at 5909 West Good Hope Road, Milwaukee—first-degree murder contrary to sec. 940.01, and armed robbery contrary to sec. 943.32(1)(a) and (2), Stats. 1977 (counts 8 and 9); and (4) September 2, 1978, the White Hen Pantry store at 6829 North Teutonia Avenue, Milwaukee (hereinafter White Hen II)—attempted armed robbery contrary to secs. 943.32(1)(a) and (2), Stats. 1977, and 939.32, and carrying a concealed weapon contrary to sec. 941.23(1), Stats. 1977 (counts 10 and 11).[2]

Prior to trial, the defendant by motion requested severance of the charges relating to the Citgo Station and the White Hen I armed robbery charges from the counts

---

[2] Hall was also charged with armed robbery, carrying a concealed weapon and reckless use of a weapon (counts 13 through 15) in relation to the armed robbery of a Super America service station at 4789 North 76th Street, Milwaukee on August 31, 1978, but these counts as well as a charge of obstructing an officer (count 16) were severed prior to trial with the state's acquiescence.

arising out of the Clark station and the White Hen II incidents. In this motion and a supporting affidavit, the defendant claimed that he was entitled to severance because: (1) A joint trial of the 12 counts relating to the four separate incidents would unduly prejudice his case by (a) "creating a substantial likelihood that the jury will be confused," and (b) "overwhelming the jury with other crimes evidence that will make it impossible for the jury to fairly assess the evidence on any one count;" and (2) failure to sever would deprive the defendant of his "constitutional right to take the stand as a witness on [his] own behalf. . . ." In support of the latter claim, Hall asserted that he wished to testify only as to the charges stemming from the Clark station and the White Hen II incidents and not those arising out of the Citgo and White Hen I crimes. Thus, he argued that joinder would leave him "no choice but to stay off the witness stand entirely," for he believed that his waiver of his Fifth Amendment privilege against self-incrimination as to any of the charges would be a waiver of that right as to all the charges jointly tried and he did not want to give up his Fifth Amendment rights as to the Citgo and White Hen I crimes "as my testimony on those matters would tend to incriminate me." In the supporting affidavit, Hall stated that he wished to offer an alibi defense and refute the statements he gave to the police regarding the Clark station counts, and further that he would testify that he did not go to the White Hen Pantry store on September 2, 1978 (White Hen II) with an intent to commit robbery nor did he make any overt actions consistent with such an intent. The trial court denied Hall's motion to sever on the ground that severance would not preclude the admission of evidence of the Citgo and White Hen I incidents at a trial on the Clark station and White Hen II crimes stating:

"Finally and determinative of the issue irrespective of the other considerations, evidence concerning the Citgo and first White Hen Pantry offenses, . . . are [sic] material and necessary to the State's case to prove the defendant's identity and intent concerning the murder which occurred at the Clark Oil Station and the intent to rob in the attempted robbery charge at which time the defendant was apprehended. Because that evidence is essential to prove every element of the crimes charged and the probativeness thereof outweighs potential confusion, time required and prejudice, the Court will admit such evidence. Severance would not cure the defendant's act of remaining silent upon some of the counts while testifying on others."

The court of appeals affirmed the trial court's denial of severance holding that the court's denial was proper and did not constitute an abuse of discretion. It rejected the defendant's claim that he was unconstitutionally required to choose between complete silence and effecting a waiver of his privilege against self-incrimination by testifying, stating " 'a defendant's subjective impressions of what he is "forced" to do during his trial are [not] enough to render his [failure to testify] involuntary.' "

The facts brought out at trial as to each of the four separate incidents are as follows:

## I. Citgo Service Station

On August 25, 1978, at about 11:30 p.m., the defendant, after pumping $3 of gas into his car, walked into the Citgo Quik Mart at 1602 East Capitol Drive in the village of Shorewood. At the time Hall entered the station, he asked the only employee on duty, Reilly, for the key to the men's room in the presence of two or three other patrons in the store. Reilly gave the key to the defendant and Hall left Reilly's sight, walking toward the bathroom. Hall returned from the men's room about 15 minutes later. In the interim, Reilly's other

customers had left and he was now alone in the station. Hall re-entered the station and walked to the rear of the building, picked up a package of styrofoam cups and carried them to the counter where Reilly was standing at the cash register, awaiting payment for the gas. Reilly started ringing up the sales, the gas and the cups, and asked the defendant if he was going to "party." Hall said "yes" and then stated "Make it quick. Make it quick." At this point, Reilly noticed that the defendant had a gun and was pointing it at his mid-section in a threatening manner. Reilly, realizing it was a holdup, opened the cash register, stating "take what I got" as he stepped away from the register. Thereupon, the defendant put the cups down on the counter, reached over the cash register with his left hand, took the money and raised his right hand holding the gun and shot Reilly in the face just below the right eye. Although the shot could have been fatal to Reilly, the bullet failed to strike any vital organs as it was lodged in Reilly's right posterior neck and subsequently removed and used in evidence.

Following the robbery, a "forensic photographer" investigating the scene found an expended .25-caliber pistol shell casing on a shelf in the station and this item was also retained as evidence.

II. *White Hen Pantry I*

On August 31, 1978, at about 1:25 a.m., Hall entered the White Hen Pantry at 6829 North Teutonia Avenue, Milwaukee, and asked the clerk, Kurt Eckenrod, the only person in the store at the time Hall entered, for a pack of cigarettes. Eckenrod tossed the cigarettes on the counter and started ringing up the sale when he felt "something" hit the left side of his head and heard a "bang." Eckenrod fell to the floor dazed and heard the defendant

depressing the keys and buttons on the two cash registers in an attempt to open them. Hall then searched Eckenrod's pockets and removed his wallet and keys. As he was leaving, Hall encountered a person known as Ronald Winkler who was driving into the White Hen Pantry's parking lot and, after walking to the driver's side of Winkler's car, stated "You better get to a telephone because the clerk inside has been shot and there is blood all over the place." Winkler summoned the police who, upon arrival, rendered aid to the victim and, upon investigation, discovered and retained as evidence a spent bullet and shell casing from a .25-caliber pistol found on the floor behind the checkout counter.

## III. *Clark Station*

Gene Paul Opalewski, attendant at the Clark station at 5909 West Good Hope Road, Milwaukee, was murdered during an armed robbery in the early morning hours (between 3 and 4:23 a.m.) of September 1, 1978. Opalewski was found lying on the floor in the cashier's booth[3] just behind the door. The cashier booth's door was found unlocked at the time the police discovered Opalewski and there were half-dollars on the floor and around the victim's body as well as in his right hand, while the cash register was empty of all currency. Relative to Hall's statement that he purchased about $5 of gas, the evidence at trial established that the self-service gas pump located nearest to the cashier's booth registered a sale of $4.78. The testimony revealed that upon investigation, the police discovered an expended shell casing for a .25-caliber pistol in the open drawer of the cash register and retained it as evidence. Further, they

---

[3] The cashier's booth was described as a small, glass enclosure with one door, a service window, some items of merchandise and a cash register surrounded by gas pumps.

found no signs of a struggle having taken place in the cashier's booth at the time of the murder.

Opalewski's death resulted from a gunshot wound to his head from a .25-caliber bullet later removed from his body during the autopsy. He was shot in the face in the right-upper eyelid and the doctor who removed the bullet concluded that the gun, when fired, was probably further than 16 to 18 inches away from the victim's face as there was "no carbonization" of Opalewski's skin.

There were no eyewitnesses to the crime and a dusting for latent fingerprints revealed none. The spent bullet removed from Opalewski's head and the expended cartridge found in the cash register drawer from the .25-caliber weapon used in the crime were received in evidence as to the identity of the perpetrator.

IV.   *White Hen II*

On September 2, 1978, Milwaukee police officer Jack Galezewski was assigned to a "plant" detail at the White Hen Pantry at 6829 North Teutonia Avenue, Milwaukee, as the result of a previous armed robbery there on August 31, 1978. The reason for this assignment was that the police were concerned as there had recently been a number of "major crimes" perpetrated at all-night business establishments in the area and the detective bureau decided to stake-out officers. Galezewski had been given Hall's description and told that Hall was armed and dangerous. After Galezewski arrived at the store at about 12:40 a.m., he took up a position in the storeroom where he could not be seen but could observe everyone that entered.

Again, Hall walked into the store in the early morning hours, at approximately 3:42 a.m. and asked Delton Johnson, the clerk for hair nets. Johnson directed Hall to the hair nets and Galezewski observed Hall walk past the

aisle with the cash registers and towards the storeroom where he stopped at a display counter. At this time, there was one other person in the store besides Galezewski, Hall and Johnson. Galezewski observed Hall place his right hand under his sport coat at about waist level and look over his right shoulder in the direction of the cash register where Johnson was with a customer. Hall then took his right hand away from his waist and started looking at the display again. A few moments later, Galezewski observed Hall perform the same movements previously noted, placing his right hand under his sport coat and looking toward the checkout counter. By this time, the customer previously at the checkout counter was either leaving or about to leave the store and Hall turned away from the display he was observing and started walking toward the cash register. At this point, Galezewski, fearing for Johnson's safety, came out of the storeroom and, speaking to Hall, stated "Freeze, Police." Hall was subsequently spread-eagled on his stomach on the floor and arrested. Galezewski then called for a "back-up" to aid him in controlling and searching the defendant. During the ensuing search, one of the officers at the scene, Robert Buska, found a .25-caliber semi-automatic pistol with a live cartridge in the chamber and a live cartridge in the magazine underneath Hall's body at waist level. At the time of his arrest and search, Hall also had an opened hair net package and a one dollar bill in his hand, five 10 dollar bills on his person and a hair net which "appeared to be protruding from his mouth."

Following Hall's arrest, ballistics tests established that the bullets removed from Opalewski's head and Reilly's neck, as well as the spent bullet found on the floor at the White Hen Pantry at 6829 North Teutonia Avenue after the August 31, 1978, armed robbery and the ex-

pended shell casings found at the armed robbery locations, were fired from the same .25-caliber semi-automatic pistol found on Hall at the time of his arrest. After being taken into custody, Hall made several statements to the police regarding the three armed robberies, all of which were introduced at trial through the testimony of various police officers.

The four statements given by Hall concerning his involvement in the Clark station murder and armed robbery were conflicting. Initially, Hall depicted himself as an innocent bystander stating that he drove to the Clark station with a man whom he identified from a photograph as Timothy Payne and that he and Payne found Opalewski on the floor in the cashier's booth in a pool of blood with a gun lying on the floor outside the door. He recited that he picked up the gun and exited. In later statements, Hall again stated that he and Payne went to the Clark station together but implicated Payne as the principal and himself only as an accomplice stating that Payne went to the cashier's booth with his (Hall's) gun and came back with more money than Payne had when they arrived at the scene. He stated that he heard a shot but did not actually see Payne fire the gun at the victim. In a fourth statement, Hall admitted the shooting but denied taking any money. According to this statement, Hall borrowed a friend's car, drove to the Clark station and put about $5 of gas in the car. He saw Opalewski in the "service station," walked in, took a gallon of Golden Guernsey milk out of a cooler and asked Opalewski if he had any hairclips.[4] Hall stated that Opalewski bent down to pick out some hairclips, saw the "butt" of Hall's pistol protruding from

[4] It should be noted that the Clark Gas Station was only a cashier's booth to accept gas purchase payments and did not offer Golden Guernsey milk for sale.

Hall's right-jacket pocket and that as Opalewski reached for the gun, a struggle ensued and both Hall and Opalewski fell to the floor. He recited that he was able to push Opalewski off him, find his gun and shot Opalewski from a kneeling position as Opalewski started to come at him. Hall stated he left without taking any money.

When Hall was questioned about the first armed robbery at the Citgo station on August 25, 1978, he stated that he "pulled" into the station in a girl friend's car with her brother, "Bucky," in the front seat with him, bought $3 worth of gas and went to the men's room. Hall recited that he returned when the victim attendant was alone, and picked up a package of styrofoam cups and carried them to the checkout counter. As in the other crimes, he was simulating a legitimate purchase. The clerk, Reilly, then made a remark to or about Hall and Hall took the .25-caliber "automatic" pistol out of his waistband, pulled the slide back and thereby automatically injected a shell into the chamber and shot Reilly. The wounded attendant fell and Hall left, taking $30 with him.

As to the White Hen I armed robbery, Hall told the police that he was in the company of a man named "Bucky" and parked Bucky's car in a service station known as Wally's located next to the White Hen Pantry store. He then walked into the store, asked for a pack of cigarettes and as the clerk turned to get them, Hall took his .25-caliber "automatic" pistol out of his waistband and struck the clerk on the back of the head with the gun, causing it to fire. Hall said he thought he had shot the attendant and ran from the store without taking any money or the attendant's keys or wallet. As the robber exited the store, he saw a man sitting in a car in the White Hen Parking lot and went up to him and sug-

gested that he call the police as someone had been shot in the head. Hall stated that as he left the scene he observed a black male enter the store and he believed that this person had taken the attendant's keys and wallet.

At trial, as to the question of identity, we note that Matthew Reilly (Citgo station attendant) and Kenneth Hessel, an eyewitness to the shooting, with Kurt Eckenrod (White Hen I) all identified Hall as the perpetrator of the respective crimes. Also, one Ronald Winkler, a witness at the White Hen I armed robbery who arrived shortly after the commission of the crime, identified Hall as the person whom he saw exiting the store at that time. It should be noted that Hall refused to testify in his own defense.

The sole issue presented for our consideration is: Did the trial court abuse its discretion in denying Hall's motion for severance of the Clark station and White Hen II charges from the Citgo and White Hen I counts?

Joinder of crimes is governed by sec. 971.12, Stats., and subs. (1) and (4)[5] provide that two or more crimes may be joined in one information and "tried together" if they "are of the same or similar character or are based

---

[5] Subs. (1) and (4) of sec. 971.12, Stats., provide:

"**Joinder of crimes and of defendants.** (1) JOINDER OF CRIMES. Two or more crimes may be charged in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. When a misdemeanor is joined with a felony, the trial shall be in the court with jurisdiction to try the felony.

"(4) TRIAL TOGETHER OF SEPARATE CHARGES. The court may order 2 or more complaints, informations or indictments to be tried together if the crimes . . ., if there is more than one, could have been joined in a single complaint, information or indictment. The procedure shall be the same as if the prosecution were under such single complaint, information or indictment."

on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." *See: Peters v. State,* 70 Wis.2d 22, 29, 233 N.W.2d 420 (1975). The defendant does not now nor has he ever claimed that the 12 counts tried to the jury were misjoined under sec. 971.12(1) and (4). Indeed, such a claim would lack merit for joinder of the counts relating to the four incidents was clearly authorized by sec. 971.12(1), as two or more crimes which are of the same or similar character and/ or as two or more acts which are "connected together." With regard to the "connection" between the separate incidents, we note that the incidents had common factors in that they were closely related in terms of time, place and *modus operandi,* scheme or plan.[6] The four incidents all occurred within a short time span of eight days involving only businesses located within the confines of the north metropolitan Milwaukee county area with the scenes of the crimes ranging from a distance of approximately 1.6 to 6.5 miles apart. The defendant used the same *modus operandi* in all the businesses victimized: (1) All-night establishments attended by a lone clerk; (2) perpetrated only during the late night or early morning hours; (3) the same weapon concealed in the assailant's waistband; (4) the same type of victim attack—assaulting or shooting in the head or face; and (5) armed robbery disguised while making a legitimate purchase.

---

[6] *See: Francis v. State,* 86 Wis.2d 554, 560, 273 N.W.2d 310 (1979), where this court stated:

"[T]he phrase 'connected together or constituting parts of a common scheme or plan' has been interpreted to mean *inter alia* that the crimes charged have a common factor or factors of substantial factual importance, *e.g.,* time, place or *modus operandi,* so that the evidence of each crime is relevant to establish a common scheme or plan that tends to establish the identity of the perpetrator. (Citations omitted)."

Rather than claiming misjoinder, Hall argues that the joinder of the 12 counts would have an overwhelming prejudicial effect on the jury and therefore severance was required under sec. 971.12(3), Stats.[7] After hearing this argument, the trial court disagreed and concluded that joinder would not be prejudicial to the defendant because the evidence of the Citgo, Clark and White Hen armed robberies, as well as the White Hen attempted armed robbery, would be admissible if separate trials were held on each of the four crimes as such evidence would be "material to the resolution of all of the crimes under consideration in regards to identity and intent." The defendant attacks the trial court's ruling in this regard claiming that the court erred in concluding that evidence of the Citgo station and White Hen I crimes would be admissible in a separate trial on the Clark station counts and the White Hen II attempted armed robbery charge. Further, the defendant reiterates that the trial court's decision in denying severance in fact compelled him to relinquish his constitutional right to testify in his own behalf as to the Clark station and White Hen II counts.

In the absence of a finding of an abuse of discretion on the part of the trial judge, a court's refusal to grant a motion for severance will not be disturbed on appeal. *State v. Bettinger*, 100 Wis.2d 691, 695, 303 N.W.2d 585,

---

[7] Sec. 971.12(3), Stats., provides:

"(3) RELIEF FROM PREJUDICIAL JOINDER. If it appears that a defendant or the state is prejudiced by a joinder of crimes or of defendants in a complaint, information or indictment or by such joinder for trial together, the court may order separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. The district attorney shall advise the court prior to trial if he intends to use the statement of a codefendant which implicates another defendant in the crime charged. Thereupon, the judge shall grant a severance as to any such defendant."

305 N.W.2d 57 (1981) ; *Holmes v. State,* 63 Wis.2d 389, 396, 217 N.W.2d 657 (1974).[8] As stated in *Bettinger, supra* at 695, "[t]his court has considered the question of prejudice arising from a joinder of criminal charges on several previous occasions." *See: e.g., Lambert v. State,* 73 Wis.2d 590, 604, 243 N.W.2d 524 (1976) ; *Peters v. State,* 70 Wis.2d 22, 28–32, 233 N.W.2d 420 (1975) ; *Bailey v. State,* 65 Wis.2d 331, 345–48, 222 N.W.2d 871 (1974) ; *Holmes v. State, supra* at 395–99. The general rule that has evolved from the cited cases is that joinder will be allowed in the interest of the public in promoting efficient judicial administration and court fiscal responsibility in conducting a trial on multiple counts in the absence of a showing of substantial prejudice. *See: Bailey, supra* at 346 and, when evidence of the counts sought to be severed is admissible in separate trials, "the risk of prejudice arising due to a joinder of offenses is generally not significant." *Bettinger, supra* at 696. *See also: Lambert, supra* at 604; *Peters, supra* at 30; *Bailey, supra* at 346, 347; and *Holmes, supra* at 397. We stated the rationale underlying this rule in *Peters, supra* at 30 as follows:

"The reason for the lack of prejudicial joinder in such cases is that, even if there were separate trials on each crime, the same evidence that would be admissible at the

[8] In *State v. Bettinger,* 100 Wis.2d 691, 696–97, 303 N.W.2d 585, 305 N.W.2d 57 (1981), we explained the rationale underlying the application of an abuse of discretion standard of review in joinder cases as follows:

"[In] considering a motion for severance, the trial court must determine what, if any, prejudice would result due to a trial on the joined charges. The court must then weigh this potential prejudice against the interests of the public in conducting a trial on the multiple counts. This balancing of competing interests involves an exercise of discretion and a trial court's determination will not be disturbed on appeal in the absence of an abuse of that discretion. (Citation omitted)."

joint trial would also be admissible at the separate trial, and so there is no ground for claiming prejudice."

The focus of our inquiry thus becomes whether the evidence of the Citgo and White Hen I counts would be admissible in a trial of the Clark station charges.[9] This presents a *Whitty*-type[10] question concerning the admissibility of evidence of other crimes. *Lambert, supra* at 604.

In this state, "other crimes" evidence is not admissible to show disposition to commit the other crimes charged: "[E]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Sec. 904.04 (2), Stats. However, evidence of other crimes is admissible "when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* That is to say, evidence of other crimes *may* be admissible if the evidence is relevant to or probative of motive, opportunity, intent, etc., and/or a specific element of the crimes charged. *Barrera v. State,* 99 Wis.2d 269, 278, 298 N.W.2d 820 (1980). The relevancy of evidence regarding other criminal conduct "depends in part upon

---

[9] The defendant can no longer claim that he has suffered substantial prejudice from the joinder of the Citgo station and White Hen I counts to the White Hen II charge of attempted armed robbery, for, as previously noted, the court of appeals reversed Hall's conviction on the attempted armed robbery charge and the state has not sought review of that ruling. *See: e.g., Bettinger, supra* at 698, n. 5, where this court stated that when a defendant is acquitted of one of the jointly tried charges, the danger of prejudice from introduction of evidence of the separate charges is not present. In this case, the court of appeals, in effect, acquitted Hall of the White Hen II attempted armed robbery charge.

[10] *Whitty v. State,* 34 Wis.2d 278, 149 N.W.2d 557 (1967) *cert. den.* 390 U.S. 959.

its nearness in time, place and circumstances to the alleged crime or element sought to be proved." *Whitty v. State,* 34 Wis.2d 278, 294, 149 N.W.2d 557 (1967) *cert. den.* 390 U.S. 959. If the other crimes evidence is admissible under sec. 904.04(2), it may nevertheless be inadmissible if "the prejudice of other crimes evidence is so great as compared with its relevancy and necessity for its admission in the particular case as to require its exclusion." *Whitty, supra* at 295. Sec. 904.03.[11]

In this case, we are satisfied that evidence of the Citgo station and White Hen I armed robbery counts, if severed, would be admissible in a separate trial on the Clark station charges as this evidence is probative of the intent element of the crimes of first-degree murder and armed robbery with regard to the Clark station incident. Further evidence of the Citgo and White Hen I charges is also probative of the identity of the Clark station armed robber. Considering the evidence relating to the crimes at the three locations, Clark, Citgo and the White Hen Pantry store, on the four separate occasions, we find that such evidence is relevant to proof of the crimes charged as a result of each individual criminal event and is not unduly prejudicial to the defendant as it is probative of the offender, Hall's, intent, identity, scheme or plan and *modus operandi* in each occurrence.

The evidence of the four distinct criminal episodes demonstrates that Hall selected only all-night business establishments with only one person in attendance. The timing

---

[11] Sec. 904.03, Stats., provides:

"**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

of the crimes establishes that Hall planned his armed robberies to take place in the late night or early morning hours when few, if any, customers would be present. In the case of the armed robberies at the Clark and Citgo stations and the first White Hen Pantry episode, Hall disguised his diabolical purpose by appearing to be on the premises to make a legitimate purchase and, if others were present, he would wait until they departed before committing the crime. Further, the record demonstrates that in the Citgo and White Hen I armed robberies, Hall concealed his pistol in his waistband until the sales clerk began ringing up his purchases. Moreover, Hall's actions in the Citgo station crimes are probative of intent, identity and scheme or plan, as to the Clark station murder and armed robbery counts as the Clark and Citgo stations incidents, as well as all four occurrences, took place within a few days of each other (one week) and appeared to be substantially similar occurrences as both attendants were shot in the face after they had rung up the perpetrator's purchases. Thus, the entire *modus operandi* of all the crimes is relevant to show that the Clark murder and armed robbery "sprang from a like mental condition," (*Barrera, supra* at 281) scheme or plan, thereby evincing an intent on Hall's part to commit murder and armed robbery. This evidence, together with the evidence of the White Hen I crimes, was also probative as to the identity of the Clark station assailant.[12] Given the proximity, similarity and common fac-

---

[12] It must be remembered that Hall does not claim prejudice as a result of the joinder of the White Hen II counts with the Clark station charges. Indeed, such a claim would be clearly lacking in merit as evidence of the White Hen II incident was necessary to establish the identity of the perpetrator of the Clark station crimes inasmuch as there were no eyewitnesses to the Clark station incident and the gun found on Hall at the time of his arrest at the White Hen Pantry store on September 2, 1978 (White Hen II) was

tors as to time, place and circumstances surrounding the Citgo station and White Hen I armed robberies to the Clark station crimes, we conclude that evidence of those charges was probative of the Clark station counts. *Whitty, supra* at 294. *See also: Barrera, supra* at 278, 280–81; *Hammen· v. State,* 87 Wis.2d 791, 799, 275 N.W.2d 709 (1979) ; *Hough v. State,* 70 Wis.2d 807, 814, 235 N.W.2d 534 (1975) ; *State v. Kuta,* 68 Wis.2d 641, 645, 229 N.W. 2d 580 (1975). Therefore, we agree with the trial court that evidence of the Citgo station and White Hen I counts would be admissible under sec. 904.04(2), Stats., at a separate trial on the Clark station charges and further that the probative value of such evidence would not be substantially outweighed by a danger of unfair prejudice, confusion of issues, waste of time or needless presentation of cumulative evidence as the same aided in proving the essential elements of the Clark station charges (intent and identity through *modus operandi,* scheme or plan). We note that the trial court gave the jury a cautionary instruction when stating that they "must consider each count, each offense separately" and that finding Hall guilty or innocent of any one offense did not "mean that [the jury] must automatically do so in respect to any or all of the others. . . ." The court also submitted jury verdict forms that were individually tailored to each count. Thus, since the charges were properly joined under sec. 971.12(1) and (4), and the evidence of the four separate criminal episodes was relevant and

the key to the identity of the Clark station armed robber and Gene Opalewski's murderer. ·Further, evidence of the White Hen II charges would also be probative of the identity of the perpetrator of the Citgo and White Hen I crimes for the same reason, namely, the gun found on Hall at the time of his arrest (White Hen II) was the same gun used in the Citgo station and White Hen I incidents, and thus such evidence would be admissible in a separate trial on the Citgo station and White Hen I counts.

not unduly prejudicial, and considering the precautionary measures taken by the trial court in submitting jury verdict forms individually tailored to each count and in instructing the jury to consider each count separately, the trial court record fails to substantiate a claim of substantial prejudice from the joinder. Cf. *Peters v. State, supra* at 31–32. *See also: Bettinger, supra,* at 699. Therefore, Hall's contention that he suffered substantial prejudice as a result of the denial of his motion to sever because of the admission of evidence of the White Hen I and Citgo charges lacks merit as such evidence would be admissible in a separate trial on the Clark station counts, and further, the trial court took the proper precautionary measures.

Hall also claims that the joinder of the White Hen I and Citgo station charges with the Clark station counts was prejudicial in that it violated his due process right to present a defense as the joinder forced him to refrain from taking the witness stand and presenting an alibi defense to the Clark station charges, and further prevented him from refuting the inculpatory statement he gave to the police admitting the shooting of Gene Paul Opalewski, the Clark station attendant. The basis for this claim is that Hall wanted to selectively testify as to the Clark station incident but exercise his Fifth Amendment privilege to remain silent regarding the Citgo and White Hen I charges and thus attempt to bar any cross-examination as to the other two armed robberies.[13] In his affidavit in support of his severance motion, Hall asserted:

[13] We note that the result reached in this case would be the same if Hall's claim were characterized as an infringement upon his Fifth Amendment privilege. *Alvarez v. Wainwright,* 607 F.2d 683 (5th Cir. 1979), and *Holmes v. Gray,* 526 F.2d 622 (7th Cir. 1975), *cert. den.* 434 U.S. 907. *See also:* Note, *The Testifying Defendant—A Proposed Rule of Limited Waiver for the Trial of Joined Offenses,* 118 Univ. of Pa. L. Rev. 424 (1970).

"If these incidents [White Hen I, Clark and Citgo stations] [14] are joined in a single trial, I will have no choice but to stay off the witness stand entirely because I do not want to give up my Fifth Amendment rights as to the Citgo and August 31st White Hen Pantry incidents as my testimony on those matters would tend to incriminate me. I will, therefore, be deprived of my constitutional right to take the stand as a witness on my own behalf on the other two incidents.

"If the incidents are not severed, I will be denied the right to testify to the effect that:

"(a) I was not present at the Clark Station on September 1st, 1978 during the time the murder allegedly occurred, but rather that I was at a number of other locations as set forth in defendant's notice of alibi. Thus, I would not and did not commit the murder with which I am charged.

"(b) The statements that I gave to the detectives concerning the Clark Station were the product of pain, confusion and misunderstanding caused by the number of people interrogating me; the number of incidents they questioned me about; my belief that I was talking about the Citgo Station when the detectives were talking about the Clark Station; my own communicative difficulties; my anxiety and lack of sleep; and the pain caused by the handcuffs that had been placed and tightened around my wrists.

"(c) I have personal knowledge that the alleged murder weapon was in the possession of someone else prior to the time of the murder on September 1st, 1978. I did not have the weapon at the time the murder allegedly took place."

In *McGautha v. California*, 402 U.S. 183, 213 (1971), the United States Supreme Court made the following comment regarding the constitutionality of requiring a

[14] Hall's affidavit also referred to joinder of the White Hen II attempted armed robbery count, but, as previously noted, the defendant can no longer claim that he was prejudiced in his trial on that charge by the joinder of the White Hen I and Citgo Station counts as his conviction on the attempted armed robbery charge was reversed by the court of appeals and the state does not challenge that holding.

defendant to choose between testifying and remaining silent:

"The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. *McMann v. Richardson*, 397 U.S., at 769. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose."

Certainly, requiring Hall to choose between (1) invoking his Fifth Amendment privilege and refraining from testifying on his own behalf as to some of the joined charges, and (2) offering direct testimony as to some of the jointly tried crimes and thereby risking proper cross-examination concerning the joined charges to which he wished to selectively invoke his Fifth Amendment privilege, is not unconstitutional in this case where evidence of the joined crimes would be properly admissible in a separate trial on the charges to which Hall claims he would testify.

In essence, the defendant asks this court to approve of a rule mandating severance when a defendant makes a tactical, arguably non-binding pre-trial expression of intent to take the witness stand and selectively testify on some but not all of the properly joined charges. In *Holmes, supra,* we rejected such a claim in the following language:

"If no more than that were required, control as to consolidation or severance of charges would clearly pass out of the hands of the trial court and into the complete control of the defendant. In this state the granting or denying of a motion for consolidation or severance as to trial is directed to the sound discretion of the trial court. . . ." *Id.* at 398–99.

Thus, given that evidence of the Citgo station and White Hen I charges would be admissible on the issues of intent, identity, *modus operandi,* scheme or plan, in a separate trial on the Clark station counts, we hold that the trial court did not abuse its discretion in denying severance.

There is another reason why Hall's expression of intent to selectively testify as to only the Clark station charges fails to establish an abuse of discretion on the part of the trial court in denying his motion of severance. The defendant's argument assumes that the prosecution would be foreclosed from asking questions and eliciting answers concerning the White Hen I and Citgo crimes if he were separately tried on the Clark station counts. In *Neely v. State,* 97 Wis.2d 38, 45, 292 N.W.2d 859 (1980), this court stated:

"It is well established that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. *McGautha v. California,* 402 U.S. 183, 215 (1971) ; *State v. Allen,* 91 N.M. 759, 581 P.2d 22, 25 (Ct. App. 1978)."

Accordingly, we held:

". . . a defendant who testifies is deemed to have waived the privilege, at least with respect to matters reasonably related to the subject matter of his direct examination, and the state is entitled to subject his testimony to adverse cross-examination." *Id.* at 49.

Thus, assuming in this case that Hall had been granted the requested severance and testified as in his affidavit, severance would not cure his dilemma of forced silence if cross-examination as to the Citgo and White Hen I charges were reasonably related to his direct testimony as cross-examination regarding matters reasonably related to the defendant's testimony on direct examination

is not barred by invocation of the Fifth Amendment privilege. *Neely, supra.* The reasonable relation test would be readily met with regard to the Citgo station charges as Hall proposed to raise the subject of the Citgo crimes in his direct testimony stating he would testify:

"The statements that I gave to the detectives concerning the Clark Station were the product of pain, confusion and misunderstanding caused by the number of people interrogating me; the number of incidents they questioned me about; *my belief that I was talking about the Citgo Station when the detectives were talking about the Clark Station; . . .*" (Emphasis supplied.)

As we stated in *Neely, supra* at 47, quoting from *Brown v. United States,* 356 U.S. 148, 155–56 (1958) :

"'[A defendant] cannot reasonably claim that the Fifth Amendment gives him not only this choice [not to testify] but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute . . . . [The defendant] could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination.'"

Also, the defendant wished to present an alibi defense to the Clark station crimes and stated he would testify that:

"I have personal knowledge that the alleged murder weapon was in the possession of someone else prior to the time of the murder on September 1st, 1978. I did not have the weapon at the time the murder allegedly took place."

Evidence of both the Citgo and White Hen I counts would challenge the veracity of this proposed testimony as: (1) Both of those incidents occurred prior to the Clark station murder and armed robbery, on August 25th and August 31, 1978, respectively; (2) Hall was identified as the culprit by both of the victims as well as by an

eyewitness (Hessel—Citgo station) and a person who arrived on the scene shortly after the crime (Winkler—White Hen I) ; and (3) ballistics tests demonstrated that the gun used by Hall in the White Hen I and Citgo crimes was the murder weapon. Thus, Hall's invocation of the Fifth Amendment privilege would not bar cross-examination as to the Citgo and White Hen I armed robberies as the evidence of those crimes bears a reasonable relationship to the Opalewski murder and armed robbery. As stated in *Raffel v. United States,* 271 U.S. 494, 497 (1926), a defendant who takes the witness stand "may be examined for the purpose of impeaching his credibility." (Citations omitted.) Hence, severance would not have afforded Hall the relief sought for cross-examination as to the Citgo and White Hen I crimes would be relevant and therefore allowed in a separate trial on the Clark station charges. Thus, we agree with the trial court that severance would not allow the defendant to testify on some counts and selectively remain silent on others, and we find that the circuit court neither exceeded nor abused its discretion in denying severance.

*By the Court.*—The decision of the court of appeals is affirmed.